Elizabeth **GUCKENBERGER,**
**et al., Plaintiffs,**

v.

**BOSTON UNIVERSITY,**
**et al., Defendants.**

**No. CIV.A. 96–11426–PBS.**

United States District Court,
D. Massachusetts.

May 29, 1998.

See also, 1998 WL 300944; 974 F.Supp. 106; 957 F.Supp. 306.

Frank J. Laski, Newton, Guy B. Wallace, Laurence W. Paradis, Disability Rights Advocates, Oakland, CA, William J. Hunt, William F. Ahern, Jr., Henry W. Clark, Clark, Hunt & Embry, Cambridge, MA, Sidney Wo-

linsky, Sid Wolinsky, Disability Rights Advocates, Oakland, CA, for Plaintiffs.

·Lawrence S. Elswit, Office of the General Counsel, Michael B. Rosen, Office of the General Counsel Boston University, Judith A. Goldberg, McDermott, Will & Emory, Alan D. Rose, Rose & Associates, Erika Geetter, Boston University, Office of the General Counsel, for Boston University, Jon Westling, Craig Klafter, Defendants.

Dale C. Kerester, Lynch, Brewer, Hoffman & Sands, Boston, MA, Jo Anne Simon, Law Offices of Jo Anne Simon, Brooklyn, NY, for Loring Brinkerhoff, Defendant.

Reed Martin, Law Office of Reed Martin, Houston, TX, for National Learning Disability Association, interested party.

Sidney Wolinsky, Disability Rights Advocates, Oakland, CA, for Disability Rights Advocates, interested partys.

## MEMORANDUM AND ORDER ON ASSESSMENT OF ATTORNEYS' FEES AND COSTS

SARIS, District Judge.

### INTRODUCTION

After prevailing in a bench trial in a discrimination action brought by learning disabled students against a private university, plaintiffs petition for an assessment of attorneys' fees and costs under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12205, and the Rehabilitation Act, 29 U.S.C. § 794a(b). Plaintiffs request slightly more than $2 million in fees and $122,000.00 in costs for the work of eight lawyers and at least eighteen clerks in California and Massachusetts. Defendant Boston University ("BU"), asserting gross overbilling and overstaffing by plaintiffs' attorneys and arguing that plaintiffs enjoyed only limited success on the merits of their claims, vigorously attacks virtually every aspect of the fee petition and takes the position that it owes plaintiffs only $274,658.00. In support of their positions, the parties inundated the Court with hundreds of pages of briefing, mounds of billing records, surveys and audits, and at least a score of affidavits from lawyers in two cities.

After hearing and analysis of billing records, the Court **ORDERS** BU to pay a total of $1,247,519.50 in fees and $52,311.23 in costs.

### BACKGROUND

The Court incorporates by reference the extensive analysis of the facts and legal issues in its three opinions in this case. *See* 957 F.Supp. 306 (D.Mass.1997) (mem. and order allowing in part and denying in part defendants' motion to dismiss and allowing plaintiffs' motion for class certification) (*"Guckenberger I"*); 974 F.Supp. 106 (D.Mass.1997) (findings of fact, conclusions of law, and order of judgment) (*"Guckenberger II"*); and Memorandum and Order on the Issue of Course Substitutions, 8 F.Supp.2d 82 (D.Mass.1998) (*"Guckenberger III"*). Here, the Court only reviews the germination of the case and its procedural history and summarizes the fee and cost request as essential background for the Court's determination of what award is reasonable based on these particular facts.

This case grew out of a sea change in BU's policies concerning reasonable accommodations provided to students with learning disabilities and attention deficit disorder during the 1995–96 school year. Attorney Frank Laski, a Boston-area civil rights attorney with specific experience in education issues, "received a concentration of calls" from such students and their parents in December 1995. (Laski Oct. 1 Decl. ¶ 3.) He began researching the policies of BU toward the learning disabled during that winter and early spring, first logging billable time in this matter on January 23, 1996 with a phone call to Anne Schneider, the mother of Andrea Schneider, a learning disabled BU student who ultimately became a named plaintiff. (*Id.* ¶ 3 & Ex. B.) Laski was responsible for contacting Attorney Sid Wolinsky, of Disability Rights Advocates ("DRA") in Oakland, California, who traveled to Boston in April 1996 for a meeting with Laski and several students and their parents. At the meeting, Wolinsky agreed on behalf of his firm to take the case jointly with Laski. (*Id.* ¶ 3.)

The plaintiffs' search for primary counsel prior to the April 1996 meeting was apparently limited to public interest firms or non-profit organizations with a specialty in disability law. Before DRA was retained, Laski had "urged the students and their parents to find additional counsel" besides him because none of the "non-profit centers" in Boston and Philadelphia with which he was associated could handle the case. (Laski Oct. 1 Decl. ¶ 3.) Laski decision to seek "co-counsel from outside Massachusetts" was based on his judgment that "this case required the skills, knowledge and experience of a number of attorneys who have represented persons with mental disabilities previously in actions for reasonable accommodations in the educational context." (Laski Feb. 4 Decl. ¶ 5.) Several attorneys employed by specialized non-profit organizations or public interest firms in the Boston area indicate that they could not have taken the case, and they agree with Laski that special expertise was required. (See Laski Feb. 4 Decl. ¶¶ 4–5; S. Schwartz Supp. Decl. ¶¶ 3–5; Griffin Decl. ¶¶ 4–5.) Plaintiffs largely ignored private general practice and civil rights firms in Boston and never contacted numerous prominent Boston trial attorneys. (See, e.g., Ashton Aff. ¶ 11; Pyle Aff. ¶ 6; Todd Aff. ¶ 10; H. Schwartz Aff. ¶ 6; Rapaport Aff. ¶ 10; Hernandez Aff. ¶ 10.)

Anne Schneider claims that, though she and "others ... preferred" to find a Boston firm, "[a]fter repeated efforts, we were unable to find a firm in the Boston area that had expertise in the necessary areas, that did not have a conflict, that was large enough to take on a case of this magnitude and was willing to undertake the contingent risk involved." (Schneider Aff. ¶ 7.) Schneider does not indicate which, if any, Boston attorneys she contacted. She only indicates that she contacted Professor Arthur Miller of Harvard Law School in an effort to retain counsel for her daughter and other students. Schneider writes that she and Professor Miller "mutually" felt several sole practitioners in Boston were "not appropriate," (id. ¶ 6), a claim Professor Miller himself denies. (Miller Aff. ¶¶ 3–4.) Without further elaboration, Schneider testifies that "I was informed that the best firm in the country to handle a matter of this nature was Disability Rights Advocates." (Id. ¶ 8.)

Despite the focus on disability specialists in plaintiffs' search for primary representation, they retained the private general practice firm of Clark, Hunt & Embry ("CH & E") as additional local counsel in July 1996, after DRA was retained. A "senior civil rights litigator" referred the case to Attorney Henry Clark of CH & E, which was selected, in Clark's view, because "it has the combined disabilities rights and trial experience and expertise necessary to handle a case of this nature ...." (Clark Aff. ¶ 12.) Clark's partner, Attorney William Hunt, describes Clark as "one of the two or three leading experts in the law of disabilities in New England." (Hunt Aff. ¶ 20.) Hunt also testifies that his own trial experience and abilities rendered him fully capable of handling this case, and at least one colleague supports his assertion. (See Hunt Aff. ¶¶ 3–4; LaCroix Aff. ¶ 5.) Other than CH & E, plaintiffs submit no evidence of attempts to secure non-specialized firms, whether public or private.

Several months later, ten students and four organizations sued the defendants for injunctive, declaratory and compensatory relief under the ADA, the Rehabilitation Act and state law. In the complaint, plaintiffs alleged that BU had: "unreasonably erected a series of harsh eligibility requirements for students who seek accommodations for their learning disabilities"; "subjected the students' accommodation requests to an unfair evaluation and appeal procedure"; and "imposed a discriminatory blanket prohibition against course substitutions for mathematics and foreign languages." *Guckenberger I*, 957 F.Supp. at 311. Additionally, plaintiffs claimed the BU "created a hostile learning environment for learning disabled students," "breached its contractual agreement to provide reasonable accommodations for such students," and caused plaintiffs emotional distress. *Id.*

The case was randomly assigned to this Court on July 16, 1996. Plaintiffs moved for a preliminary injunction to enjoin the change in BU's policies toward the learning disabled, but BU's agreement to a partial standstill on

September 5, 1996 mooted the motion. All parties urged this Court to resolve the case before the start of the following academic year. Discovery proceeded at a fast clip. Plaintiffs moved for class certification, and BU moved to dismiss. On January 28, 1997, the Court allowed plaintiffs' motion for class certification for injunctive relief only and allowed in part and denied in part BU's motion to dismiss the majority of plaintiffs' claims and certain named plaintiffs and defendants. *See id.* at 327. The majority of plaintiffs' case remained intact, and BU answered on February 14, 1997. After plaintiffs' claim for class damages was denied on March 7, 1997, a ten-day bench trial was held from April 7 to April 18, 1997. The Court issued its findings of fact, conclusions of law and order of judgment on August 15, 1997. *Guckenberger II,* 974 F.Supp. at 106.

Both sides proclaimed victory in the media. *See, e.g.,* Jon Westling, Editorial, *One University Defeats Disability Extremists,* Wall St. J., Sept. 3, 1997, at A21; Patricia Nealon, *BU Loses Suit Brought By Students,* Boston Globe, Aug. 16, 1997, at B1 (quoting Attorney Wolinksy's characterization of the ruling as a "ringing condemnation" of BU's actions). Neither side appealed.

In *Guckenberger II,* this Court ordered BU to engage in a deliberative procedure to determine whether course substitutions for foreign languages would constitute a fundamental alteration in its liberal arts curriculum. *See* 974 F.Supp. at 154–55. On December 2, 1997, after several meetings, BU's Dean's Advisory Committee concluded that course substitutions would constitute a fundamental alteration, and President Westling agreed. Plaintiffs challenged this determination in a new round of briefing. After hearing, this Court concluded on May 29, 1998 that BU had complied with my order. *See Guckenberger III,* Memo. and Order at 19.

Plaintiffs filed this motion for attorneys' fees and costs on October 22, 1997. In support, plaintiffs have submitted to the Court an accounting of legal services amounting to almost 6,700 hours in attorney time and more than 1,800 hours in the time of paralegals and law clerks. The computer-generated compendia of diary sheets, which appear in several forms, are collectively hundreds of pages long and include literally thousands of entries which list the billers' names, dates, hours spent and, in various degrees of detail, a description of services rendered. Six of the eight attorneys filed affidavits in support of their requests, and plaintiffs appended affidavits from several other attorneys practicing in the San Francisco and Boston areas in support of the requests.

BU responded with a strongly-worded 95–page brief in opposition and fifteen-page rebuttal memorandum. Additionally, the University submitted a telephone-book-sized volume filled with affidavits of two of its counsel and other attorneys as well as other related documents. It relied heavily on the report of a "legal auditor," James P. Schratz, who analyzed the plaintiffs' billing records in detail and offered his recommendation to the Court on its appropriate action in this matter.

Charging $435 per hour, the lead trial attorney at DRA, Attorney Wolinsky, logged 2,344.8 hours over eighteen months (an average of 30 billed hours per week) at a billed cost—for his work alone—of $1,019,988.00. Two other attorneys at DRA together ask for compensation for a total of 2,017.6 hours, billed at $215 and $295 per hour, at a cost of $460,275.50. "Various clerks" at DRA add another 1,817.63 hours, billed at $95 per hour, at a cost of $172,674.85. DRA, then, asks the Court to order BU to pay the firm for 6,180.03 hours of time at a cost of over $1.65 million. Four attorneys and a clerk at CH & E logged a total of 2,135 hours costing, at rates ranging from $85 to $295 per hour, an additional $536,079.50. Finally, Attorney Laski, the sole practitioner who originally conceived of this action, billed 203.8 hours, at $275 per hour, and requests $56,045.00 for that time. The total fee requested by plaintiffs' counsel is $2,245,062.85. In an exercise of "billing judgment," plaintiffs subtracted 10% from those fees for a final attorneys' fees request of $2,020,556.56.

In addition to its request for fees, DRA requests $111,297.77 in itemized costs as well as an "estimate" of "Interoffice Costs" of $5,950.00. CH & E requests $4,858.30 in reimbursable costs.

## DISCUSSION

■ Both the ADA and the Rehabilitation Act allow the awarding of attorneys' fees to the prevailing party. *See* 42 U.S.C. § 12205; 29 U.S.C. § 794a(b).[1] Neither party disputes that the framework applied to fee awards in civil rights actions, 42 U.S.C. § 1988, applies to this case.[2] *See Roe v. Cheyenne Mountain Conference Resort, Inc.*, 124 F.3d 1221, 1232 (10th Cir.1997); *Pottgen v. Missouri State High Sch. Activities Ass'n*, 103 F.3d 720, 723 (8th Cir.1997); *cf. Paris v. United States Dep't of Hous. and Urban Dev.*, 988 F.2d 236, 238 (1st Cir.1993) (applying baseline § 1988 prevailing party inquiry to claim under Equal Access to Justice Act). BU rightly concedes that plaintiffs satisfy the relatively low threshold required to qualify for "prevailing party" status. *See Farrar v. Hobby*, 506 U.S. 103, 109, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992); *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 789, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989); *Williams v. Hanover Hous. Auth.*, 113 F.3d 1294, 1299 (1st Cir.1997).

■ Because plaintiffs are "prevailing parties" in this litigation, they are entitled to recover a fee award. "However, the fact that they were the prevailing parties does not mean that they can recover for all the time spent in this litigation." *Culebras Enters. Corp. v. Rivera–Rios*, 846 F.2d 94, 102 (1st Cir.1988). Instead, the Court calculates a reasonable fee award using the lodestar method, which "is the strongly preferred method by which district courts should determine what fees to award prevailing parties ...." *Coutin v. Young & Rubicam P.R., Inc.*, 124 F.3d 331, 337 (1st Cir.1997). To arrive at an appropriate award, the Court "must evaluate the data submitted by the fee-seeker, compute a lodestar, consider the totality of the adjustment factors approved by Congress and the [Supreme] Court, ...

and make specific, reasoned adjustments if it is to arrive at a reduced fee award." *Id.* at 340.

The Supreme Court has warned that a dispute over fees and costs should not "spawn a second litigation of significant dimension." *Texas State Teachers Ass'n*, 489 U.S. at 791, 109 S.Ct. 1486. Theoretically, this Court is not required to produce a "painstaking" explanation of its decision, which is reviewed "deferentially," according substantial respect to the trial court's informed discretion." *Coutin*, 124 F.3d at 336–37. As a practical matter, however, a survey of recent case law demonstrates that the First Circuit examines these "discretionary" decisions extremely closely, as evidenced by language in a string of recent reversals of district court decisions on fee applications. *See, e.g., McMillan v. Massachusetts Soc'y for the Prevention of Cruelty to Animals*, 140 F.3d 288, 310–11 (1st Cir.1998); *Rodriguez–Hernandez v. Miranda–Velez*, 132 F.3d 848, 858–60 (1st Cir.1998); *Coutin*, 124 F.3d at 342; *Williams*, 113 F.3d at 1297–98. I proceed with care.

### A. Calculating the Lodestar

■ The lodestar approach "contemplates judicial ascertainment of 'the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate' as the starting point in constructing a fee award." *Coutin*, 124 F.3d at 337 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). Though the prevailing party is under an obligation to submit a request for fees including its calculations of hours expended multiplied by a requested hourly rate, the Court "has a right—indeed, a duty—to see whether counsel substantially exceeded the bounds of reasonable effort." *United States v. Metropolitan Dist. Comm'n*, 847 F.2d 12, 17 (1st Cir.

---

1. The two statutes read, in relevant part: "In any action or administrative proceeding commenced pursuant to [the ADA], the court ..., in its discretion, may allow the prevailing party ... a reasonable attorney's fee, including litigation expenses, and costs ...," 42 U.S.C. § 12205; and "In any action or proceeding to enforce or charge a violation of a provision of [the Rehabilitation Act], the court, in its discretion, may allow

the prevailing party ... a reasonable attorney's fee as part of the costs." 29 U.S.C. § 794a(b).

2. Section 1988 reads in relevant part: "In any action or proceeding to enforce [a listed civil rights statute], the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs ...." 42 U.S.C. § 1988(b).

1988) (internal quotation omitted). "[T]he law firm's bill need not be swallowed whole by the client's litigation adversary just because it is the law firm's bill." *Id.* The Court, then, must engage in a thoughtful analysis of the number of hours expended and the hourly rates charged to ensure both are reasonable. "In these and other ways, the trial court, though adhering to the time-and-rate-based method of fee calculation, may fashion a lodestar which differs substantially from the fee requested by the prevailing party." *Coutin,* 124 F.3d at 337.

Here, the Court sets out the standard it applied uniformly to plaintiffs' attorney records in arriving at reasonable hours figures. Then, after explaining the standard applied for hourly rates, the Court applies both standards to each lawyer (and the clerks) to arrive at the lodestar.

### 1. *Reasonable Hours Expended*

Plaintiffs' counsel submitted stacks of billing records, which the Court reviewed in arriving at a reasonable fee. Generally, plaintiffs' counsel met their burden of submitting "detailed contemporaneous time records." *Lipsett v. Blanco,* 975 F.2d 934, 938 (1st Cir.1992) (quoting *Grendel's Den v. Larkin,* 749 F.2d 945, 952 (1st Cir.1984)). However, the "trial bench need not feel handcuffed by counsel's submission of time records, no matter how elaborate." *Metropolitan Dist. Comm'n,* 847 F.2d at 18. "To the contrary, the presiding judge must draw on [her] experience and wisdom in deciding whether the time spent on each phase was in excess of a reasonable amount." *Id.* (alterations and internal quotation omitted); *see also Grendel's Den,* 749 F.2d at 952–55 (analyzing closely the hourly billings of two attorneys to ferret out excess).

"Typically, a court proceeds to compute the lodestar amount by ascertaining the time counsel actually spent on the case 'and then subtract[ing] from that figure hours which were duplicative, unproductive, excessive, or otherwise unnecessary.'" *Lipsett,* 975 F.2d at 937 (quoting *Grendel's Den,* 749 F.2d at 950); *see also Coutin,* 124 F.3d at 337. The First Circuit has "never required that [district] courts set forth hour-by-hour

analyses of fee requests" when calculating the number of reasonable hours expended on the case. *Metropolitan Dist. Comm'n,* 847 F.2d at 16 (quoting *Jacobs v. Mancuso,* 825 F.2d 559, 562 (1st Cir.1987)). Nevertheless, when a district court makes a substantial reduction in fees requested, the Court "should offer reasonably explicit findings" and "has a burden to spell out the whys and wherefores." *McMillan,* 140 F.3d 288, 310 (quoting *Brewster v. Dukakis,* 3 F.3d 488, 493 (1st Cir.1993)). Put another way, the Court must explain its "thought process and show the method and manner underlying its decisional calculus." *Coutin,* 124 F.3d at 337.

### (a) *Excessive Hours*

The Court agrees with BU that plaintiffs' counsel overstaffed and overbilled this case. Based on my knowledge of this case, despite the excellent representation by class counsel, I come to the reluctant conclusion that the expenditure of 8,500 hours of legal services, including over 2,300 hours billed by the lead trial attorney, Sid Wolinsky, is facially excessive. Wolinsky utilized two other attorneys and, by my count, eighteen law clerks in his own office. Five more attorneys were involved in the Boston area.

The primary cause of the overbilling was over-conferencing. The time sheets are replete with conferences among co-counsel. These revealed near-constant bi-coastal efforts to coordinate case "strategy" and "status." Telephonic and personal conferences occurred on a daily basis—often several times a day with different groups of plaintiffs' attorneys. BU urges, and there is legal support for, complete elimination or significant reduction of the hours spent conferencing. *See McMillan,* 140 F.3d 288, 311 n. 18 (affirming district court's total elimination of hours spent by one attorney's "consulting with" the trial attorney about the case); *Hart v. Bourque,* 798 F.2d 519, 522–23 (1st Cir.1986).

Though elimination of these hours is tempting, the Court declines to deduct fully the hundreds of hours spent conferencing because of the particular nature of this case. The heated disputes of this expedited and

high profile case required herculean efforts by multiple counsel, and "[c]areful preparation often requires collaboration and rehearsal ...." *Rodriguez–Hernandez*, 132 F.3d at 860. Furthermore, BU's counsel, to their credit, posed a formidable obstacle to plaintiffs' success. "[B]ecause a litigant's staffing needs and preparation time will often 'vary in direct proportion to the ferocity of her adversaries' handling of the case, this factor weighs heavily in the balance.'" *Id.* (quoting *Lipsett*, 975 F.2d at 939). Finally, "[t]ime spent by two attorneys on the same general task is not ... per se duplicative," *id.*, and the Court concludes that, though plaintiffs' counsel conferred too much, the case demanded some degree of coordination.

However, just as there can be too many cooks in the kitchen, there can be too many lawyers on a case. My review of the records convinced me that some deduction must be made to account for the overstaffing of this case and the excessive conferencing that, perhaps inevitably, resulted. There was a great deal of "redundancy" in the plaintiffs' attorney structure, and the Court concludes that this was certainly a case when, at some point "there [came] a time of diminishing returns." *Ackerley Communications, Inc. v. City of Somerville*, 901 F.2d 170, 172 (1st Cir.1990). Excessive telephone calls and conferences represent a duplication of effort for which less than full fare should logically be charged for all participants. *Cf. Hart*, 798 F.2d at 523. Courts within this circuit, faced with similar facts, have significantly reduced the charges for co-counsel conference time. *See, e.g., Weinberger v. Great N. Nekoosa Corp.*, 801 F.Supp. 804, 819 (D.Me.1992) (disallowing 80% of time spent in co-counsel conferences), *aff'd*, 47 F.3d 463 (1st Cir.1995); *Mokover v. Neco Enters., Inc.*, 785 F.Supp. 1083, 1090 (D.R.I.1992) (reducing charges for co-counsel conferences by 20%).

*(b) Core v. Non–Core*

▮ To provide a rational structure for such a reduction as it combed the billing records, the Court applied a distinction between "core" legal work and "non-core" legal work, a "well-settled" practice that is "appropriate" based on these records. *See*

*McLaughlin v. Boston Sch. Comm.*, 976 F.Supp. 53, 62 (D.Mass.1997). Generally, assigning "different rates to different tasks" is an "approved practice" in the First Circuit. *Metropolitan Dist. Comm'n*, 847 F.2d at 19; *see also Brewster*, 3 F.3d at 492; *cf. McMillan*, 140 F.3d 288, 307; *Lipsett*, 975 F.2d at 937 & 939–40 (directing courts to apply "hourly rates to the constituent tasks"). The application of either differential or uniform rates is a matter of discretion in the First Circuit, *see Maceira v. Pagan*, 698 F.2d 38, 40–41 (1st Cir.1983), which may explain why not all cases apply the distinction. *Cf., e.g., Deary v. City of Gloucester*, 9 F.3d 191, 198 (1st Cir.1993); *Phetosomphone v. Allison Reed Group, Inc.*, 984 F.2d 4, 7–8 (1st Cir. 1993); *Ackerley Communications*, 901 F.2d at 171–72. Co-counsel conferences may be considered "non-core." *McLaughlin*, 976 F.Supp. at 62; *cf. Morgan v. Gittens*, 915 F.Supp. 457, 469 (D.Mass.1996). Based on the excessive conferencing, the Court concludes that discretionary application of non-core rates is appropriate in this case.

▮ During its record review, the Court designated time entries as non-core not only when they involved co-counsel conferences but also in accordance with the taxonomy that has been approved by the First Circuit. Core work "includes legal research, writing of legal documents, court appearances, negotiations with opposing counsel, monitoring, and implementation of court orders." *Brewster*, 3 F.3d at 492 n. 4. All conversations with opposing counsel were considered core, as were the writing and reading of internal memoranda (because each involves independent legal thought). Non-core work, on the other hand, "consists of less demanding tasks, including letter writing and telephone conversations." *Id.; see also McMillan*, 140 F.3d at 307. "In addition, non-core services also include attendance at court hearings in a non-participatory capacity ...." *McLaughlin*, 976 F.Supp. at 62 (citing *Hart*, 798 F.2d at 523).

Based on the number of attorneys used by BU and the nature of the trial, the Court considered the trial time of plaintiffs' three primary attorneys—Sid Wolinsky, Guy Wal-

lace and William Hunt—to be core. Included in "trial time" were all hours worked, including co-counsel conferences during the trial and in the several days immediately preceding trial. However, the time of all other attorneys and clerks was charged as non-core time throughout the actual trial period. *See Grendel's Den*, 749 F.2d at 953 (reducing the time spent by an attorney with a largely observatory role at trial); *Hart*, 798 F.2d at 523.

■ Normally, time spent preparing fee petitions is considered non-core. *See Brewster*, 3 F.3d at 494. While the Court charged as non-core all lawyers' time spent merely documenting "what they did and why they did it," the Court considered all work on the legal basis for the fee award to be core due to the significant legal disputes on this issue. *Morgan*, 915 F.Supp. at 472.

■ Finally, in applying the non-core distinction, the Court faced the difficulty of numerous "block-billed" entries containing mixed strings of core and non-core tasks with a single time figure. Time must be recorded "in appropriately small increments." *Jacobs*, 825 F.2d at 563. Though BU argues that all such "block-billed" entries should be deducted, the Court decided, in fairness, to consider the hours in all mixed entries as one-half core, one-half non-core.[3]

■ In keeping with approved First Circuit practice, the Court applied rates for non-core hours at two-thirds the approved billing rates it assigned for core legal work. *See Brewster*, 3 F.3d at 492; *McLaughlin*, 976 F.Supp. at 62.

#### (c) Sundries: Travel, Overhead and Imprecision

■ In addition to marking entries as non-core, the Court eliminated a few time entries for several reasons. Time spent traveling during which no specific legal work was recorded was eliminated, particularly in view of the Court's finding *infra* that the retention of California counsel was not essential. *See Hart*, 798 F.2d at 523. Since work of administrative staff should be considered as part of "overhead," the Court eliminated that portion of time charged by the "law clerks" at DRA that was purely administrative. *Jacobs*, 825 F.2d at 563. The Court also, on a few occasions "deducted hours from the total requested where the records were not sufficiently precise . . . ." *Deary*, 9 F.3d at 198; *see also Lipsett*, 975 F.2d at 938.

#### (d) Unsuccessful Claims

■ Though BU urged it to do so, the Court, with one exception, did not deduct hours spent on claims or motions that were ultimately unsuccessful. *See McMillan*, 140 F.3d at 310 (permitting courts to make such deductions); *Coutin*, 124 F.3d at 337 (same) (citing *Hensley*, 461 U.S. at 435, 103 S.Ct. 1933). It declined to do so for three principal reasons. First, "attempts to allocate hours between claims may be unwarranted where an action involves related legal theories applied to a common core of facts." *Phetosomphone*, 984 F.2d at 7; *cf. McMillan*, 140 F.3d 288, 310. Second, the Court should not attempt to parse out work on unsuccessful claims hour-by-hour " '[w]here it would be an exercise in futility.' " *Lipsett*, 975 F.2d at 940–41 (quoting *General Dynamics Corp. v. Horrigan*, 848 F.2d 321, 325 (1st Cir.1988)) (other internal quotations omitted). Third, because the Court may consider less-than-complete success as a factor in *adjusting* the lodestar, *see Coutin*, 124 F.3d at 339, extraction of "unsuccessful" hours when *calculating* the lodestar would run the risk of

---

**3.** Though every attorney mixed core and non-core work in the same entry at some point in his bill, Wolinsky was perhaps the strongest example of the billing problem. Two examples from plaintiffs' bill, each charged by the Court as "one-half core, one-half non-core," illustrate the point. On March 13, 1997, Wolinsky billed 8.2 hours for the following:

> Teleconference with M Newman re House keeping; text of Agresto depo for insertion in brief; addition to foreign language section and

exclusion of evidence revise and addition to final draft; meetings with GW re both briefs; meeting with P Ely re chart of Westling non-compliance; exhibits for same.

On July 30, 1996, Wolinsky billed 3.7 hours for the following:

> Met w/ Larry Paradis re status; TC w/ co-counsel; memo re same; met w/ AA and LP re discovery; dictate depo questions for JW; sent WR discovery files.

doubly reducing the award. *See Phetosom-phone*, 984 F.2d at 8. The one exception is that the Court eliminated all legal fees for post-judgment motions and matters (other than work on the fees petition) because none was successful.

The results of the application of these principles to plaintiffs' records, which reflect a reasonable number of hours to have expended on this litigation, are reflected *infra* (section A.3.) and in Appendix A.

### 2. *Reasonable Hourly Rates*

The second part of the calculation of the lodestar is the setting of an hourly rate for each attorney and clerk. The applicable rates are "those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Grendel's Den*, 749 F.2d at 955 (quoting *Blum v. Stenson*, 465 U.S. 886, 895 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)); *see also Lipsett*, 975 F.2d at 937 (applying the "prevailing rates in the community for comparably qualified attorneys"). As with the tabulation of reasonable hours, the Court should not accept attorney submissions at face value but rather should "assign more realistic rates to time spent." *Coutin*, 124 F.3d at 337. Two issues are presented by this case: which "community" is the relevant market; and whose rates within that community should be considered "comparable."

#### (a) A Tale of Two Cities

One of the hottest disputes in this "second litigation" is whether out-of-town counsel may charge higher San Francisco rates instead of those prevailing in Boston. The lawyers of DRA, based in Oakland, claim that the rates they charge in California and have been awarded in California courts, should apply to this case because this was "a highly complex case of first impression" requiring the retention of "specialists in class action disability discrimination cases" such as themselves. They maintain that no such specialists exist in Boston. Plaintiffs argue that no firm in Boston fit this case's needs better than DRA.

To succeed on this point, plaintiffs must overcome a presumption that local Boston rates apply to this case. *See Maceira*, 698 F.2d at 40; *National Wildlife Fed'n v. Hanson*, 859 F.2d 313, 317 (4th Cir.1988) ("The community in which the court sits is the appropriate starting point for selecting the proper rate."). Plaintiffs have the "burden of rebutting the presumption that local rates apply by bringing forward evidence that would justify the expenditure of higher rates." *Morse v. Republican Party*, 972 F.Supp. 355, 364 (W.D.Va.1997). To do so, plaintiffs must show that "[t]he complexity and specialized nature of a case may mean that no attorney, with the required skills, is available locally." *National Wildlife Fed'n*, 859 F.2d at 317 (quoting *Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760, 768 (7th Cir. 1982)); *see also Barjon v. Dalton*, 132 F.3d 496, 500 (9th Cir.1997). "Unless the subject of the litigation is so unusual, or requires such special skills that only an out-of-state lawyer possesses, the fee rates of the local area should be applied even when the lawyers seeking fees are from another area." *Jane L. v. Bangerter*, 61 F.3d 1505, 1510 (10th Cir.1995) (quotation omitted); *see also Maceira*, 698 F.2d at 40 (requiring use of the local rate "for example, in an ordinary case requiring no specialized abilities not amply reflected among local lawyers").

Correspondingly, out-of-town rates have typically been allowed, both within and without the First Circuit, when a "specialist" was required for the handling of the case and a "smaller community" does not have one available. *Maceira*, 698 F.2d at 40 (finding that there were no attorneys available in Puerto Rico with sufficient experience to handle a case involving "complex Landrum–Griffin Act issues" and "Teamster dissidents"); *see also, e.g., Palmigiano v. Garrahy*, 707 F.2d 636, 637 (1st Cir.1983) (allowing New York rates in Rhode Island prisoner rights case because out-of-town counsel "brought to the case experience and resources not easily duplicated locally"); *National Wildlife Fed'n*, 859 F.2d at 317–18 (holding that Washington, D.C. rates applied to complex environmental litigation in Raleigh, North Carolina); *Bonilla v. Trebol Motors Corp.*, Civil No. 92–1795(JP), 1997 WL 178861, at *27 & *30

(D.P.R. Mar.27, 1997) (allowing Chicago and South Carolina rates for RICO case involving several international entities in a case which "might well serve as the prototypical case for which the services of out-of-town counsel are justified"); *Weinberger v. Great N. Nekoosa Corp.*, 801 F.Supp. 804, 813–14 (D.Me.1992) (allowing New York rates because of out-of-town counsel's "specialized expertise in take-over litigation that local counsel may lack"); *Kersch v. Board of County Comm'rs*, 851 F.Supp. 1541, 1544–45 (D.Wyo.1994) (allowing Denver rates in Wyoming civil rights litigation because "[d]efendants have failed to show that there are attorneys in the local community, or anywhere in Wyoming, who are able to supply this special expertise").

On the other hand, courts have refused to apply out-of-town rates when no "specialty" was required or when the bar of a local community could have been equal to the task. *See, e.g., Ackerley Communications*, 901 F.2d at 171 (refusing to allow D.C. rates for appellate argument before the First Circuit in Boston); *Grendel's Den*, 749 F.2d at 955 (confining rate evaluation to Boston market rather than "a small group of nationally prominent constitutional law scholars"); *Mokover v. Neco Enters., Inc.*, 785 F.Supp. 1083, 1090–91 (D.R.I.1992) (reducing rates of New York lawyers because local counsel in the case as well as others in the community "could have ably handled this securities action"); *Wagenmann v. Pozzi*, Civ.A.No.79–1658–F, 1986 WL 11754, at *3 (D.Mass. Oct.17, 1986) (assigning local Springfield, Massachusetts rates to out-of-town Boston attorneys where "several members of the local bar are well equipped to handle civil rights cases such as this one"); *Morse*, 972 F.Supp. at 364–65 (awarding lower local Charlottesville, Virginia rates to Washington, D.C. attorneys of prevailing voting rights plaintiffs despite the "specialized nature . of the voting rights bar," none of whom practiced locally). Plaintiffs have not pointed to, and the Court is unaware of, any case set in a Boston courtroom in which out-of-town rates were allowed .due to the lack of local attorneys competent and available to take the case.

Plaintiffs have not shown that out-of-town counsel were required due to lack of competence in the local bar. As the affidavits submitted in support of plaintiffs' request make clear, the DRA attorneys stake their pitch for higher rates on the argument that only a specialized public interest disability litigation boutique could have handled this case. However, the inquiry is slightly different, because it is the fee-seeker's burden to demonstrate "that a local attorney could not have provided plaintiffs with competent representation." *Morse*, 972 F.Supp. at 365. The Court agrees with the affidavits of the several Boston attorneys speaking on this point that they, or others here in Boston, could have handled this case. The Court, familiar with the facts and law of this case, is unconvinced that only a "specialized" practice such as DRA could have provided adequate, or even stellar, representation for the plaintiffs. A litigant is entitled to attorney's fees "for an effective and completely competitive representation," but no more. *Grendel's Den*, 749 F.2d at 953–54. The CH & E affidavits, professing that firm's capability to handle this case, support the Court's conclusion. With over thirteen years of experience on the state and federal benches, this Court has presided over numerous trials, handled well by local law firms, which involved factual and legal issues as (or more) complex than those in this case.

As to the argument that no local counsel were available, plaintiffs offer no specific evidence that they ever seriously considered other options within the local market. The Court finds compelling the large number of affidavits from highly-regarded civil rights trial attorneys who were not contacted about the case. Plaintiffs argue that any ex post claims by Boston attorneys that they would have "considered" the case are "speculative," but the argument misses the point; the search for representation was too confined, and large potions of the bar were never given the opportunity, ex ante, to consider the case. *See Hadix v. Johnson*, 65 F.3d 532, 535 (6th Cir.1995) ("[J]udges may question the reasonableness of an out-of-town attorney's billing rate if there is reason to believe that competent counsel was readily available locally at a lower charge or rate.") Plaintiffs

present no evidence, for example, that they contacted any major law firms with pro bono practices. The Court concludes that the decision to retain significantly higher priced out-of-town counsel, as primary trial counsel, was unreasonable in light of the extensive legal talent and abundance of lawyers within the Boston community. *See Maceira,* 698 F.2d at 40. While DRA's expertise was helpful, a local law firm could well have served as primary trial counsel and consulted with it to draw on that expertise. In light of plaintiffs' "judgment call" to retain DRA, Boston rates will apply. *See Ackerley Communications,* 901 F.2d at 172.

### (b) Boston Rates

Having decided that Boston rates apply to *all* of plaintiffs' counsel, the Court must determine the applicable rates within the Boston market. The fee-seeker has the additional burden of providing the Court with "information about fees customarily charged in the locality for similar legal services and information about the experience and billing practices of the attorneys in question." *Calhoun v. Acme Cleveland Corp.,* 801 F.2d 558, 560 (1st Cir.1986); *see also Deary,* 9 F.3d at 198 (requiring other evidence of prevailing market rate besides affidavits of participating attorneys themselves). "Fee litigation under § 1988 depends on what the market rate is rather than what litigants and judges think it ought to be." *Pressley v. Haeger,* 977 F.2d 295, 299 (7th Cir.1992); *see also Missouri v. Jenkins,* 491 U.S. 274, 285–86, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989).

Plaintiffs offer little in the way of evidence on Boston legal rates. They suggest that some senior attorneys at large corporate law firms in Boston charge rates equal to or greater than the $435 per hour requested by Wolinsky. Of course, hourly rates "are to be calculated according to the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or nonprofit counsel." *Blum v. Stenson,* 465 U.S. 886, 895, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). However, plaintiffs must not show merely that higher rates exist in the market, but also that "the requested rates are in line with those prevail-

ing in the community *for similar services* by lawyers of reasonably comparable skill, experience and reputation." *Id.* at 895 n. 11, 104 S.Ct. 1541 (emphasis added). Plaintiffs, offering little evidence about Boston rates at all, do not show that the few Boston attorneys charging even higher rates than Wolinsky are offering similar services.

BU more than adequately fills the hole in plaintiffs' proof. Numerous prominent private Boston attorneys with vast experience in civil rights cases, almost all of whom would have been more than capable of handling this case, charge a range of rates significantly lower than those requested by the California lawyers. The affidavits submitted by BU demonstrate: that rates for senior private civil rights trial attorneys typically fall around $250 per hour (*see, e.g.,* H. Schwartz Aff. ¶¶ 8 & 11); that other partners in trial firms with experience in civil rights cases charge between $200 and $275 per hour (*see, e.g.,* Rapaport Aff. ¶ 12; Pyle Aff. ¶ 7; Todd Aff. ¶ 6); and that relatively junior attorneys are billed by these firms at well under $200 per hour (*see* Todd Aff. ¶ 6; Rose Aff. ¶ 13).

"[T]he court is [also] entitled to rely upon its own knowledge of attorney's fees in its surrounding area in arriving at a reasonable fee ...." *Andrade v. Jamestown Hous. Auth.,* 82 F.3d 1179, 1190 (1st Cir.1996). Rates in excess of $300 per hour for Boston trial attorneys in large corporate firms (where rates include high overhead costs) have been approved in this District. *See Arthur D. Little Int'l, Inc. v. Dooyang Corp.,* 995 F.Supp. 217, 224 n. 1 (D.Mass.1998) (Saris, J.) (finding rate of $325 per hour reasonable for litigation partner in large Boston firm); *Visiting Nurse Ass'n v. Bullen,* C.A. No. 94–10123–NG, slip op. at 10 (D.Mass. Oct. 2, 1995) (Gertner, J.) (approving $345 per hour and $320 per hour for senior litigators in large Boston corporate firm).

With all of this in mind, the Court applied rates for the lawyers in this case ranging from $140 to $325 per hour, depending on experience, skill and reputation.

3. *Application of Legal Standard to Each Biller*

Having defined the legal principles used as it reviewed the billing records of plaintiffs' counsel, the Court determines the reasonable hours and rates for each attorney and the various clerks as follows. Due to rounding and the elimination of some of the hours claimed, the hours calculations do not always balance exactly the amount requested. I toyed with the idea of resubmitting the bills to Plaintiffs for recalculation under this core/non-core dichotomy. However, that approach would turn into a third litigation, and I have no desire to write *Guckenberger V.* The Court's rate-and-hour determinations and resulting calculations are set forth as a table in Appendix A.

*(a) DRA*

*Sid Wolinsky* billed 2,344.8 hours as the lead trial attorney. He performed substantial independent legal work but also spent almost one-third of his time coordinating the case with other attorneys. Wolinsky participated in conferences almost daily to assign work, to receive reports on work, to talk strategy and for other undefined purposes. Though his records were detailed, they generally were not broken down, as required, into small increments of time which would have allowed the Court easily to determine the amount of time spent on a given task. Wolinsky was the only one in his firm to charge for travel; the Court disallowed those hours based on its conclusion that the retention of a San Francisco firm was a judgment call by the plaintiffs and because the entries give no indication of what, if any, work was done while traveling. After review of the records, the Court determined that Wolinsky performed 1,602 hours of core legal work and 546 hours of non-core legal work.

A Princeton alumnus, Wolinsky, graduated Yale Law School in 1961. He has over 36 years of litigation experience, focusing primarily on disability law. His requested rate of $435 per hour has been approved by courts as reasonable within the San Francisco market. His credentials are sterling, and his considerable abilities place him among the elite civil rights trial attorneys in the

relevant market, Boston. As such, the Court sets a reasonable hourly rate for his core time at $325 per hour, which is at the high end of attorneys of similar skills, experience and reputation offering similar services. His non-core time will be compensated at a rate of $220 per hour.

*Guy Wallace* billed more hours on the case, 1,682.4, than anyone other than Wolinsky. Although he did not play a prominent role examining witnesses at trial, he was responsible for the lion's share of brief writing and legal research and played a vital management role in the presentation of the plaintiffs' case. The Court considered him to be one of the three principal trial attorneys for billing purposes. His records were detailed and billed in small increments. He, like all plaintiffs' attorneys, engaged in a large amount of co-counsel conferencing. The Court determined that Wallace billed 1,318 hours of core legal work and 286 hours of non-core legal work.

Wallace has practiced exclusively in the field of disability law since graduation from Harvard Law School in 1993. He requests the rate of $215 per hour, based on the San Francisco market. The Court concludes that the reasonable hourly rates in the Boston market for someone of his experience and abilities are $180 per hour core and $120 per hour non-core.

*Laurence Paradis* is the executive director of DRA. To describe his role as limited would be an overstatement. I do not recall that he ever appeared in my courtroom. According to defense counsel, he attended no depositions or court hearings, and participated in no meetings with BU's counsel. Nevertheless, he requests compensation for 334.1 hours. His billing records reveal that he acted almost exclusively as a sounding board in meetings, which he describes only as being about "case strategy." He did only minor independent work that was important to the prosecution of the case. Additionally, his records were vague and often entirely inadequate, including numerous entries limited to "preparation for trial" months before the trial occurred; he listed large numbers of entries reading "rvu correspondence and

memos re: case status and strategy," often without any elaboration.

Paradis requests an hourly rate, based on San Francisco rates, of $295 per hour. He did not submit an affidavit, and he provided the Court with no information about his experience other than his position. *See Calhoun,* 801 F.2d at 559–60 (preferring submission of attorney affidavits but not finding a failure to file fatal). Based on the inadequacy of his billing, the lack of an affidavit, and the minimal sounding-board nature of his work on the case, the Court determines that his time should not be compensated. *See McMillan,* 140 F.3d at 311 n. 18 (leaving elimination of time of one lawyer spent "consulting" with principal trial attorney to the district court's discretion).

*Law Clerks/Paralegals* who were sworn by Wolinsky to have been paid by DRA, billed well over one thousand hours in this case. Jung Park, Patricia Kirkpatrick and Allison Aubry performed the vast majority of substantive work done by clerks on the case, including research, legal writing and some client contact—all of which was considered by the Court to be core legal work. Each also performed some amount of non-core work that was borderline clerical or administrative. Park's records tended to be vague, which resulted in some disallowance. Amy Whelan, a fourth clerk, performed more as a legal secretary and kept substandard records, many hours of which were disallowed as excessive, administrative or too vague. All clerks, like every attorney involved in this case, engaged in a substantial amount of conferencing, which the Court considered non-core. The Court tallied the compensable hours as follows: Park, 335 hours core and 124 non-core; Kirkpatrick, 304 hours core and 217 non-core; Aubry, 252 hours core and 53 non-core; Whelan, 103 hours core and 147 hours non-core. Plaintiffs additionally will be compensated for 124 hours core and 27 hours non-core for the work of a number other minor named clerks at DRA. The hours of a handful of "clerks" who performed primarily as administrative assistants or observers were eliminated.

■ The work of paid law clerks and paralegals may be compensated at prevailing market rates. *See Missouri v. Jenkins,* 491 U.S. 274, 286–87, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989). Plaintiffs request $95 per hour for these clerks. Based on the Court's knowledge of Boston-area paralegal rates, their assigned rates are $60 per hour core and $40 per hour non-core. *See Dooyang,* 995 F.Supp. at 225 (applying core rate of $65 per hour for a Boston paralegal with extensive documented experience).

### (b) CH & E

*William Hunt* was responsible for directing the management of the case from CH & E. He conducted many of the depositions and participated in brief writing, and the Court considers him to be the third principal trial attorney for billing purposes. A relatively small portion of his time was spent coordinating the management of the case with colleagues in his office and at DRA. He requests compensation for 887.4 hours. Of those, the Court determined that he should be compensated for 718 hours of core legal work and 129 hours of non-core legal work.

Hunt requests an hourly rate of $295 per hour. He did not, however, submit evidence of what rate he typically charges his clients or of what rate, if any, has been deemed reasonable for him by a court in a similar case. *See Calhoun,* 801 F.2d at 560. A graduate of Suffolk Law School, he has been a general practice trial attorney for 20 years. Based on his experience and my observation of his work, the Court determines that rates of $275 per hour core and $185 per hour non-core are appropriate.

*William Ahern,* a partner at CH & E, requests compensation for 589.1 hours. Though he participated in many aspects of the case, including the preparation of witnesses for depositions, the taking of three depositions and the defending of several others, much of his time was spent as the principal conduit between his offices and DRA. The Court calculated that he reasonably should be compensated for 368 hours of core legal work and 203 hours of non-core legal work, almost all of which was spent conferencing.

Like his partners, Ahern did not submit to the Court any evidence that his standard fee to clients approaches his requested rate of $275 per hour. He has been a general practice litigator for more than 15 years. Based on the Court's observations of his work and his experience, it sets his hourly rate at $250 per hour core and $165 per hour non-core.

*Henry Clark,* another partner at Clark, Hunt & Embry, requests compensation for 110.7 hours of billable time. The Court's review of his records revealed that his role, like Paradis's in Oakland, was largely as a sounding board in meetings, and he himself indicates that a substantial part of his work on this case was advisory. (Clark Aff. ¶ 11.) He performed only minor independent legal "intake" work related to this litigation. He did not, to my knowledge, perform any role at trial or the hearings. Although he sat in on one deposition, he never took or defended any.

Clark is a 1989 law school graduate with impressive disabilities law experience. He requests a rate of $275 per hour, though he does not indicate what relation, if any, that rate bears to the rate he typically charges. Based on his inadequate affidavit and his primarily advisory role, I decline to award any fees.

*Michael Newman* is a junior attorney at CH & E. Though he performed varied tasks, his primary responsibility during this case was close contact with clients. Like most lawyers involved in this case, however, he spent a sizable amount of time coordinating with other attorneys in his office and in Oakland. His billing entries, totalling 542.9 hours, were precise and recorded in appropriately small increments. After review, the Court determined that he recorded 350 hours of compensable core legal time and 174 hours of non-core legal time.

Newman is a 1995 graduate of the University of Miami Law School. His firm requests compensation for his time at the rate of $150 per hour. Based on his experience, the Court awards rates of $140 per hour core and $95 per hour non-core.

CH & E will not be compensated for the minor observatory hours of its single clerk, Deborah Kirrane.

### (c) Frank Laski

Laski is responsible for the origination of this complaint. Virtually all of his work was performed during the first several months of this litigation. An excellent advocate, Mr. Laski, from the getgo, was reasonable with respect to case management, and his efforts were largely responsible for the success of the stand-still agreement. Despite his critical role in bringing the other attorneys into this case, he appropriately kept all "conferencing" to a minimum in his charges. Though he attended trial each day, he does *not request compensation after the first day* (which the Court considers non-core). He requests compensation for 203.8 hours; the Court determined that he should be compensated for 180 hours of core legal work and 20 hours of non-core legal work.

Laski's requested rate of $275 per hour is amply supported by the record's reflection of appropriate rates in the Boston market and by my observations of his superior abilities. A 1967 graduate of Harvard Law School, he has been an attorney for more than 30 years and is one of the leading civil rights attorneys in the area. His non-core time will be compensated at $185 per hour.

### 4. Lodestar

The lodestars which result from the above figures are:

| | |
|---|---|
| DRA: | $1,002,130.00 |
| CH & E: | $ 412,340.00 |
| Laski: | $ 53,200.00 |
| Total: | $1,467,670.00 |

### B. Adjustment of the Lodestar

"Once established, the lodestar represents a presumptively reasonable fee, although it is subject to upward or downward adjustment in certain circumstances." *Lipsett,* 975 F.2d at 937 (citing *Blum,* 465 U.S. at 897, 104 S.Ct. 1541). The Court may exercise its "authority to adjust the lodestar" only "in accordance with accepted principles." *Coutin,* 124 F.3d at 337 (citing *Hensley,* 461 U.S. at 429–31, 103 S.Ct. 1933). A "preeminent consideration in the fee-adjust-

ment process" is the "results obtained" by the plaintiffs. *Coutin*, 124 F.3d at 338 (citing *Hensley*, 461 U.S. at 432 & 440); *see also Rodriguez–Hernandez*, 132 F.3d at 859 ("In a civil rights lawsuit, '[t]he result is what matters ....'"). In adjusting the lodestar, a court "'may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success.'" *Andrade*, 82 F.3d at 1191 (quoting *Hensley*, 461 U.S. at 436) The guiding principle, nonetheless, is that "a court should award only that amount of fees that is reasonable in relation to the results obtained." *Id.*

■ The First Circuit considers, in combination, three "meanings" of the term "results obtained:" "a plaintiff's success claim by claim," "the relief actually achieved," and "the societal importance of the right which has been vindicated." *Coutin*, 124 F.3d at 338. Each meaning requires brief discussion.

### 1. *Claim–by–Claim Success*

■ "If a plaintiff prevails on only some of multiple claims, then a fee reduction may be in order." *Coutin*, 124 F.3d at 339. In contrast, where plaintiffs have "prevailed up and down the line" on their claims, "a claims-based, results-obtained fee reduction is wholly inappropriate." *Rodriguez–Hernandez*, 132 F.3d at 859 (quoting *Coutin*, 124 F.3d at 340). A reduction on these grounds is also inappropriate where "unsuccessful claims were based on a common core of facts and related legal theories." *Id.; cf. McMillan*, 140 F.3d 288, 1998 WL 110164, at *18–*19 (questioning the relationship of a 20% cut to the number of hours expended by counsel on unsuccessful claims because "the court in this case provided no elaboration for the reduction").

### 2. *Relief Actually Achieved*

■ The second meaning is critical to this case. "Sometimes, the plaintiff will prevail on all her claims, but will receive limited (though not insubstantial) redress." *Coutin*, 124 F.3d at 339. "[I]t remains within the district court's discretion to reduce a fee award in response to limited relief even in

the presence of complete claims-based success." *Id.* at 340. "*Hensley* makes clear that where multiple claims are interrelated and a plaintiff has achieved only limited success, awarding her the entire lodestar amount would ordinarily be excessive." *Andrade*, 82 F.3d at 1191 (citing *Hensley*, 461 U.S. at 436, 103 S.Ct. 1933). "[A] fee reduction in response to a scanty damage award or a shortfall in other relief entails a subjective evaluation of damages awarded and nonmonetary relief obtained, and is substantially more difficult to quantify." *Coutin*, 124 F.3d at 338.

### 3. *Societal Importance of the Right Vindicated*

■ The third meaning attached to the term "results obtained" refers more broadly to the impact of the case on others similarly situated. Attorney fees should be awarded in a way consistent with "the recognized principle that even small damage awards may mean a substantial victory for 'a policy that Congress considered of the highest importance.'" *Lewis v. Kendrick*, 944 F.2d 949, 955 (1st Cir.1991) (quoting *City of Riverside v. Rivera*, 477 U.S. 561, 575, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986)). A substantial attorneys' fee award may be maintained, even in the case of limited or nominal damages, based on "the importance of providing an incentive to attorneys to represent litigants ... who seek to vindicate constitutional rights but whose claim may not result in substantial monetary compensation" and "the deterrent impact" of litigation. *O'Connor v. Huard*, 117 F.3d 12, 18 (1st Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 691, 139 L.Ed.2d 636 (1998).

### 4. *The Bottom Line*

After looking at the three meanings of "results obtained" together, *see Coutin*, 124 F.3d at 338, the Court concludes that the failure of plaintiffs to succeed on all of their claims and to obtain all of their requested relief supports a reduction of the lodestar by fifteen percent.

### (a) Plaintiffs' Successes

Plaintiffs prevailed on most of the significant aspects of this litigation, save one key issue. First, although they did not press the motion for preliminary injunction, the filing of this litigation resulted in a "standstill agreement" which preserved the rights of then current students at Boston University through the date the Court issued its opinion. Essentially BU agreed that students with learning disabilities who were then enrolled could rely on the previous policies with respect to accommodations and testing in effect prior to the 1995–96 school year and on promises made to them regarding course substitutions.

Second, this Court allowed the motion to certify the class pursuant to Fed.R.Civ.P. 23(b)(2).

Third, this Court concluded that BU had violated the disabilities laws in the 1995–96 school year with its eligibility criteria which required a student with a learning disability to be retested every three years, regardless of need, and which accepted only the evaluations of medical doctors, licensed clinical psychologists and individuals with doctorate degrees. Although the retesting requirement was modified to provide for a "waiver", at least in part in response to the threat of this litigation, I enjoined the use of the criteria for the evaluators with respect to students with learning disorders who had then current evaluations.

Fourth, this Court awarded damages to individually named plaintiffs for BU's failure to provide reasonable accommodations in violation of the Rehabilitation Act and breach of contract amounting to approximately $30,000. The Court found that the university made decisions with respect to reasonable accommodations based on uninformed stereotypes (i.e., Somnolent Samantha).

Fifth, this Court found that BU had not met its burden of demonstrating that it made a reasoned deliberation as to whether modifications in its foreign language requirements would change the essential academic standards of its liberal arts curriculum and ordered it to do so.

### (b) Plaintiffs' Claim- and Relief-Based Failures

Plaintiffs lost on some issues, too. First, I rejected a hostile learning environment claim and a claim of intentional infliction of emotional distress. Second, I dismissed certain associational plaintiffs on the ground that they lacked standing, and narrowed the scope of the requested class. Third, I concluded that there was no evidentiary basis for the challenge to BU's requirement that IQ test scores be provided, or its decision not to allow course substitutions in Mathematics. Fourth, while I found the process for evaluating accommodation requests in the 1995–96 school year to be discriminatory, I concluded that it had been reformed, albeit in response to this law suit, and declined to provide the sweeping request for equitable relief sought by plaintiffs, which would essentially have required me to put the learning disabilities program into court receivership. Fifth, I concluded that there was no private cause of action to enforce the challenge to BU's weak appeals/grievance provision. Sixth, I refused to allow the plaintiffs to press privacy claims not in the complaint. Finally, I rejected plaintiffs' cornerstone contention that BU's blanket refusal to authorize course substitutions for students with learning disabilities amounted to failure to modify the university's practices to prevent discrimination as required by federal law.

I find, without considering the course substitutions issue, that reduction of fifteen percent is appropriate because of these issues which plaintiffs lost. Most of these issues involved discrete legal issues—e.g., the claim of hostile learning environment, or the availability of an implied cause of action under a regulation to challenge an appellate procedure—which were not in the heartland of this litigation and did not consume much briefing or evidentiary time. The claims concerning the IQ tests and course substitutions in mathematics were throwaways; they were denied precisely because only minimal evidence addressed the contentions. BU won some skirmishes with respect to its current policies, and the reasonableness of policies for students with Attention Deficit Disorder. However, the factual and legal core of this

case was the unlawful discrimination in the 1995–96 academic year—and there, the plaintiffs won the day.

Defendants emphasize that the amount of damages was low, and that plaintiffs had requested sweeping equitable relief, most of which was not granted. While plaintiffs' request for relief was unrealistic in light of the changed environment at BU after the lawsuit, the broad equitable relief requested did not consume much briefing or trial time. They also point out that over 300 hours was expended on plaintiffs who did not testify at trial and for whom no damages or other relief were granted. The thrust of this so-called "impact" litigation was never monetary, and very little court time was spent on damages for emotional distress or breach of contract. Indeed, that was the hardest piece of the opinion for me to write because the proposed findings of fact and conclusions of law did not address in detail the individual claims for damages. I have factored in the time spent on absentee plaintiffs, and plaintiffs who received nominal amounts, in arriving at the 15 percent reduction to the lodestar.

### (c) Course Substitutions

In fairness to BU, it was a winner on its key issue. I found it complied with my order by conducting a reasoned deliberation that it was not required to provide course substitutions in foreign languages. However, the best way to deal with that significant victory is to lop off all post-judgment attorneys' fees incurred by plaintiffs in challenging BU's decision and procedure. There were also post-judgment motions filed by class counsel with respect to individual named plaintiffs which were denied. No attorneys fees will be awarded for those either, and I did not consider these post-judgment hours in arriving at the fifteen percent lodestar reduction.

### C. Costs

"The attorneys' reasonable and necessary costs and expenses may be awarded to a prevailing party ...." *Culebras Enters. Corp. v. Rivera–Rios,* 846 F.2d 94, 103 (1st Cir.1988).

DRA requests $117,247.77 in costs. The Court concludes that DRA kept its costs within reasonable limits and sufficiently detailed most of their expense entries for meaningful review. (*See* Wolinsky Decl. Dkt. # 269 Ex. C.) Several entries of the "Detailed Case Costs" submitted by DRA, especially related to expert fees, should have been more explicit, but in general the costs submitted bear a rational relation to the extent of this litigation and to the details of the different activities which occurred. Further, the submission indicates an effort to keep costs to a minimum where possible. (*See id.* ¶ 40.) Though BU objects to the awarding of any travel costs due to the plaintiffs' "unreasonable" retention of out-of-town counsel, the Court concludes that the logic applied to rate-setting does not necessarily apply in this context, that DRA actually expended the listed amounts for travel, and that the amounts spent were reasonable in the circumstances.

The Court, however, makes several deductions. Five entries, totalling $483.14, were either blank or too vague to warrant reimbursement. The Court eliminates in its entirety the charge, totalling $17,858.50, for "word processing." *See Jacobs,* 825 F.2d at 563 (eliminating administrative staff costs). The Court also eliminates the "estimate" of $5,950.00 for "interoffice costs" because the figure gives the Court absolutely no indication whatsoever of what portions ("faxing, copying, postage, telephone charges, supplies, etc.") of the total were allocated to which interoffice costs.

Part of DRA's request for costs is $45,454.70 in expert witness fees. The Civil Rights Act of 1991 made explicit what previously had been a matter of some debate: "In awarding an attorney's fee ..., the court, in its discretion, may include expert fees as part of the attorney's fee." 42 U.S.C. § 1988(c). Defendants argue that plaintiffs are not entitled to expert fees because of inadequate documentation. I agree. A reading of all of the fees statutes, and common sense, dictates that expert fees, like attorneys' fees, may only be awarded if the Court determines that they are "reasonable." *See* 42 U.S.C. §§ 1988(b) & 12205; 29 U.S.C. § 794a(b). Here, plaintiffs offer the Court absolutely no

grounds for assessing the "reasonableness" of the fees charged. There is no indication of each expert's rate, hours spent, nature of work, tasks performed, dates, etc.—in essence, nothing other than the total charged. The submissions are entirely insufficient as a matter of law. *See Lipsett,* 975 F.2d at 938 (explaining more rigid documentation requirements in context of attorneys' fees). Though exclusion is lamentable because several of the experts, particularly Dr. Shaywitz, were extremely helpful to the Court, plaintiffs' failure to submit even the slightest documentation forces the Court's hand here. The total amount of costs awarded to DRA, then, is $47,452.93.[4]

 The Court allows the full amount of costs requested by CH & E of $4,858.30, which is certainly a reasonable assessment given the length of this litigation. The telephone charge of $575, included therein, is reasonable.

D. *Taps*

This was a battle over the interplay between a relatively new law, the Americans with Disability Act, and the principle of academic freedom. Waving the banner in favor of academic freedom, BU threw down the gauntlet on its view of the disabilities law. Waving their pennant in favor of the disabled, plaintiffs took on the crusade. Unfortunately, after all the important issues have been resolved and the dust has settled in this very significant litigation, which was tried well by all, the Court is put in the unpleasant position of having to bean-count in determining the amount of reasonable attorneys' fees. However, nothing that has been said in this opinion is meant to undercut in any way the important dialogue that this case furthered.

### ORDER

The Court **ORDERS** Boston University to pay plaintiffs the following as the assessment of attorneys' fees and costs which the Court, in its discretion, deems reasonable:

(a) attorneys' fees of $1,247,519.50, distributed as follows: $851,810.50 for the attorneys' fees of Disability Rights Advocates; $350,489.00 for the attorneys' fees of Clark, Hunt & Embry; and $45,220.00 for the attorney's fees of Frank Laski, Esq.; and

(b) $47,452.93 for the costs advanced by Disability Rights Advocates; and $4,858.30 for the costs advanced by Clark, Hunt & Embry.

(c) BU should deduct from the payment pursuant to this order the amount it has already paid to the plaintiffs for fees and costs (approximately $274,658.00).

*SO ORDERED.*

APPENDIX A

| Biller (amount requested) | Hours | | Rate | | Lodestar |
|---|---|---|---|---|---|
| *DRA:* | | | | | |
| SID WOLINSKY (2,344.8 × $435) | | | | | |
| Core | 1,602 | x | $325 | = | $520,650.00 |
| Non-core | 546 | x | $220 | = | $120,120.00 |
| GUY WALLACE (1,682.4 × $215) | | | | | |
| Core | 1,318 | x | $180 | = | $237,240.00 |
| Non-core | 286 | x | $120 | = | $ 34,320.00 |
| LAURENCE PARADIS (334.1 × $295) | | | | | |
| | | | | | $ 0.00 |
| VARIOUS CLERKS (1,803.63 × $95) | | | | | |
| Core | 1,118 | x | $ 60 | = | $ 67,080.00 |

4. Because of the lack of recent caselaw on the requisite documentation for expert fees, this is one area where the Court would consider a motion for reconsideration, with affidavits and without briefs over five pages.

| Biller (amount requested) | Hours | | Rate | | Lodestar |
|---|---|---|---|---|---|
| Non-core ..................... | 568 | x | $ 40 | = | $ 22,720.00 |

DRA LODESTAR TOTAL ................................... $1,002,130.00
 less 15% .......................................................... $851,810.50

*CH & E:*

WILLIAM HUNT (887.4 × $295)

| | | | | | |
|---|---|---|---|---|---|
| Core ......................... | 718 | x | $275 | = | $197,450.00 |
| Non-core ..................... | 129 | x | $185 | = | $ 23,865.00 |

WILLIAM AHERN (589.1 × $275)

| | | | | | |
|---|---|---|---|---|---|
| Core ......................... | 368 | x | $250 | = | $ 92,000.00 |
| Non-core ..................... | 203 | x | $165 | = | $ 33,495.00 |

MICHAEL NEWMAN (542.9 × $150)

| | | | | | |
|---|---|---|---|---|---|
| Core ......................... | 350 | x | $140 | = | $ 49,000.00 |
| Non-core ..................... | 174 | x | $ 95 | = | $ 16,530.00 |

HENRY CLARK (110.7 × $275)

 ............................................................... $ 0.00

CH & E LODESTAR TOTAL ............................... $412,340.00
 less 15% .............................................. $350,489.00

*FRANK LASKI* (203.8 × $275)

| | | | | | |
|---|---|---|---|---|---|
| Core ......................... | 180 | x | $275 | = | $ 49,500.00 |
| Non-core ..................... | 20 | x | $185 | = | $ 3,700.00 |

LASKI Lodestar Total ...................................... $ 53,200.00
 less 15% .............................................. $ 45,220.00