UNITED STATES of America ex rel. Randy J. AVERBACK, M.D. and on behalf of the United States of America Plaintiffs

v.

PASTOR MEDICAL ASSOCIATES P.C., Bruce M. Pastor, M.D., Ronald M. Katz, M.D., Joyce Pastor, Janfield Co., and Medicalab, Inc. Defendants

No. CIV.A. 99–11124–WGY.

United States District Court, D. Massachusetts.

Sept. 27, 2002.

Sidney Gorovitz, Max Borten, Gorovitz & Borten, Waltham, MA, for Plaintiffs.

Paul R. Cirel, Dwyer & Collora, LLP, Boston, MA, Sidney Gorovitz, Gorovitz & Borten, Lexington, MA, for Defendants.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.

## I. INTRODUCTION

Following a settlement between the government and the defendants after the gov-

ernment intervened in an action brought by the relator in this case, Randy J. Averback, M.D. ("Averback"), Averback has applied to this Court for an award of attorney's fees pursuant to the fee-shifting provisions of the False Claims Act, 31 U.S.C. § 3730(d)(1). Under this section, attorney's fees are mandatory when a false claim matter is decided in favor of the relator and assessed against the defendant: "Any [prevailing relator] shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorney's fees and costs. All such expenses, fees and costs shall be awarded against the defendant." *Id.*

Averback claims an hourly rate of $325 an hour for the "core" work of her two attorneys, Max Borten, Esq. ("Borten") and Sidney Gorovitz, Esq. ("Gorovitz"), and $217 an hour for their "non-core" work. Averback claims that Borten performed 272.30 hours of core work and 11.40 hours of non-core work, and that Gorovitz performed 76 hours of core work and 5 hours of non-core work. Taken together, Averback submits that the work of both attorneys adds up to a total lodestar figure of $116,756.30, which Averback argues should be enhanced by a factor of 1.5 times based on her degree of success in this action for a total of $175,134.45, along with costs of $2,304.90, bringing the total figure of attorney's fees claimed by Averback to $177,439.35.

The defendants, Pastor Medical Associates et. al., (collectively "Pastor"), contend that Averback's lodestar calculation is far too high. Pastor argues that neither Borten nor Gorovitz are sufficiently experienced in this type of litigation to charge the hourly rate a partner at a major law firm could charge for an action of this type, i.e. $325 an hour for core work and $217 for non-core work. Pastor further

submits that neither of Averback's attorneys have supported their purported qualifications with affidavits or other evidence as required under the law of this circuit. Pastor proposes compensation more commensurate with the relator's counsel's alleged relative lack of experience. It suggests an hourly rate between $150 and $225 an hour for core work and a similarly lower hourly rate for non-core work. Pastor also alleges that much of the work done by Averback's attorneys was duplicative and derived from a separate private action against the defendants and should therefore not be charged to them. In addition, Pastor also argues that many of the hours designated as "core work" by Averback's attorneys consisted of delivering papers and filings and should be charged at a lesser hourly rate as "non-core work." Finally, Pastor strenuously objects to any upward adjustment of the lodestar amount based on the degree of success, alleging that the settlement was based on only one claim and that most of the original claims brought by Averback actually produced no result. Characterizing this action as one in which 80% of the claims brought by the relator were unsuccessful, and therefore reasoning that the relator contributed very little to the overall settlement, Pastor asks this Court for a significant *downward* adjustment in the lodestar amount, which would proportionately reflect this lack of success by awarding Averback only 10 to 20% of the final lodestar amount that this Court determines to be proper.

## II. BACKGROUND

This action arose out of claims against Pastor Medical Associates, P.C., a medical practice located in Brookline, Massachusetts. In 1996, Dr. Bruce Pastor decided to sell Pastor Medical Associates, P.C. to the Beth Israel Physicians Organization. Averback, a physician employed by Pastor

Medical Associates, P.C., was not invited to participate in the package offered to other doctors in the practice. She resigned on September 2, 1996. She subsequently filed a civil action in Middlesex Superior Court against Pastor Medical Associates, P.C. and Dr. Pastor on August 22, 1997, alleging a variety of tort and breach of contract claims. See Defendants' Opposition to Relator's Motion for Award of Legal Fees ("Def.'s Opp."), Exhibit 3 [Docket No. 61]. Summary judgment was granted against many of her claims, although she ultimately prevailed on two of them. Meanwhile, Pastor Medical Associates, P.C. successfully counterclaimed against her for the amount that it alleged it had overpaid her. *Id.* at Ex. 2. Averback filed another claim in Middlesex Superior Court on April 22, 1999, which was dismissed on the ground that she had a prior acting pending. *Id.* at Ex. 4. She appealed but lost. *Id.* at Ex. 5.

During the litigation of these state-court private actions, Borten joined Averback's lead counsel, John P. White, Esq. and other lawyers at the law firm of White, Inker & Aronson, as co-counsel beginning on January 28, 1998. Affidavit of Libby G. Fulgione at ¶ 7 [Docket No. 70]; Affidavit of Max Borten at ¶ 9 [Docket No. 69]. Soon thereafter, Borten advised Averback that she had a potential claim under the False Claims Act against Pastor that could be brought in federal court, but that the statute of limitations on such a claim was running out. Because White refused to bring these federal claims until the private state law claims were resolved, Averback advised White and his associates that their relationship would soon be terminated, and on February 24, 1999, the firm withdrew from the case. Borten took over the representation of her private claims from that point until June 24, 1999, at which time Gorovitz filed his appearance as co-counsel in Averback's private claims. Borten Affi-

davit at ¶¶ 10–13, Fulgione Affidavit at ¶¶ 7–9.

In March 1999, Averback first informed the United States Attorney's Office of the District of Massachusetts of her intention to file an action under the False Claims Act as a relator. Borten Affidavit at ¶ 14. Borten asked Gorovitz to join as co-counsel in this federal action because he did not believe he had the requisite experience in dealing with the FBI and the U.S. Attorney's Office. *Id.* at ¶ 15. In April, Averback, Borten, and Gorovitz met with FBI special agent in charge of Health Care Fraud, Antonette L. Dennis ("Agent Dennis"). Id. at ¶ 16.

In May, at the request of Agent Dennis, Averback, through her attorneys, Borten and Gorovitz, initiated the *qui tam* action at issue in this case by filing a formal complaint under seal, asserting that Pastor had violated the False Claims Act and other federal statutes. *Id.* at ¶ 16. In a 65–page complaint containing 179 paragraphs, Averback asserted 12 separate counts for relief, alleging that Pastor had violated the Stark Statutes, 42 U.S.C. § 1395nn; the False Claims Act, 31 U.S.C. §§ 3729–3733; and the Civil Monetary Penalties Law, 42 U.S.C. § 1320a–7b. The Complaint summarized the nature of Pastor Medical Associates, P.C.'s allegedly false claims as falling under four general theories of liability:

a) the product of a series of illegal contractual agreements and physician referrals that violate the anti-kickback provisions contained in 42 U.S.C. § 1320a–7b(b);

b) the product of prohibited referrals that violate provisions contained in 42 U.S.C. § 1395nn(a)(1);

c) the product of ordering medically unnecessary clinical testing (EKG) in viola-

tion of 42 U.S.C. § 1320a–7b and 42 U.S.C. § 1395; and

d) the product of upcoding and the degree and extent of medical services provided to patients at the Recuperative Center in violation of 42 U.S.C. § 1320a–7b and 42 U.S.C. § 1395.

Complaint ¶ 3. [Docket No. 1]. More specifically, among other allegations, Averback alleged violations of the Civil Monetary Penalties Law and the Stark Statutes arising from Pastor Medical Associates, P.C.'s lease of both radiology equipment and space to Medicalab Inc. and laboratory equipment from Janfeld Co., respectively. Complaint at ¶¶ 1, 31, 45–48, 63–65, 70; & 30, 49, 59, 65, 124–132, 133–141. Averback also asserted that Pastor Medical Associates, P.C. (as well as Doctors Pastor and Katz individually) caused false bills to be submitted to Medicare for laboratory work, radiology, imaging and EKG claims that were not medically necessary. Complaint at ¶¶ 50–53, 76–83, 84–91, 92–99. Averback also claimed that Pastor Medical Associates, P.C. and Dr. Pastor violated the Stark Statutes by distributing income to physicians based in part on their proportionate share of the income generated by their radiology referrals. Complaint at ¶¶ 162–170, 171–179. Averback additionally asserted that Pastor Medical Associates, P.C. and Dr. Pastor violated the Stark Statutes by compensating its physicians in a manner that gave its doctors an incentive to have laboratory tests conducted by, and made billable to, PMA's in-house laboratory. Complaint at ¶¶ 142–151, 152–161.

Pastor's counsel met with lawyers from the U.S. Attorney's Office to discuss this action on October 27, 2000. Affidavit of Phyllis A. Flora at ¶ 5 [Docket No. 62]. After subsequent meetings, the parties ultimately signed a settlement agreement in August 2001. Relator's Motion for Legal Fees ("Rel.'s Mot"), Exhibit C ("Settlement Agreement and Release") [Docket No. 56]. Throughout this time, the U.S. Attorney's investigation concentrated on the so-called "Stark II" violations: the claims alleging that Pastor Medical Associates, P.C. violated the Stark Statutes in distributing the income from its office laboratory by dividing the net income among its physicians based on their proportionate share of the collections derived from all services they provided, physician and ancillary. Flora Affidavit at ¶ 6. Pastor Medical Associates, P.C. settled this claim of improper income distribution by agreeing to pay $230,000 to the United States. Meanwhile, the government agreed to pay Averback, the relator, $41,400 of this settlement. Settlement Agreement and Release, ¶¶ 1, 7. Averback, as part of this settlement, agreed to dismiss with prejudice all of the claims asserted in this action, and released Pastor and the employees of Pastor Medical Associates, P.C. from all claims except those being litigated in state court. Id. at ¶¶ 6, 8. The defendants admitted no wrongdoing in this settlement; indeed, the Settlement Agreement includes provisions stating that "nothing herein shall be construed as an admission that [Pastor] violated any regulation or law or engaged in any wrongdoing," and that "nothing in this agreement, including payment of the Settlement Amount, is or shall be construed as a sanction, disciplinary action, limitation, restriction, reprimand, or censure." Id. at ¶ 22.

■ On January 22, 2002, this Court ordered Averback [Docket No. 66] to provide proof that the billing invoice attached to her motion represented contemporaneous time records;[1] such proof was provid-

---

1. Absence of such proof of contemporaneous

billing records, except in extraordinary cir-

ed to the Court, Response of Relator to Court's Order [Docket No. 67], along with an affidavit from Borten swearing to such, explaining counsel's billing practices, and affirming that the hours billed were wholly unrelated to the private state action. *See* Borten Affidavit [Docket No. 69].

## III. DISCUSSION

It is settled law that under the "American Rule," federal courts will deny recovery of attorney's fees absent explicit statutory authorization from Congress. *E.g. Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). The explicit statutory authorization for the fees requested by Averback is found in 31 U.S.C. § 3730(d), which makes mandatory the granting of "reasonable" attorney's fees and costs against the defendant to a prevailing relator. *Id.* Therefore, this Court's duty in this case is confined to determining the reasonable amount to be awarded as attorney's fees and costs against Pastor. The fact that Averback is entitled to attorney's fees is not in dispute; only the amount is.

In defining "reasonable" attorney's fees, the United States Supreme Court has taken two approaches since the 1970's. The first is the "lodestar approach,"[2] based on the product of hours expended multiplied by an hourly rate for attorneys in the relevant market; the second method is the Model Code approach, which combines the lodestar calculation with various other factors such as "degree of success obtained," "novelty," and "complexity." *See generally* 2 Mary Francis Derfner & Arthur D.

Wolf, Court Awarded Attorneys Fees ¶ 15.03 (1998 & Supp.2000).

The "lodestar" approach is, in essence, an attempt by a court to award attorney's fees by first determining a reasonable amount of hours expended by the lawyers when performing their work in the case at issue and then multiplying that number by the prevailing market rate. It requires the district court to multiply the number of hours "reasonably expended on the litigation" by a "reasonable hourly rate." *Coutin v. Young & Rubicam P.R., Inc.*, 124 F.3d 331, 337 (1st Cir.1997) (*quoting Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). "To determine the number of hours reasonably spent, one must first determine the number of hours actually spent and then subtract from that figure hours which were duplicative, unproductive, excessive, or otherwise unnecessary." *Grendel's Den*, 749 F.2d at 950. To determine a reasonable hourly rate, the district court should consider "prevailing rates in the community for comparably qualified attorneys," *Lipsett v. Blanco*, 975 F.2d 934, 937 (1st Cir.1992) (*quoting United States v. Metro. Dist. Comm'n*, 847 F.2d 12, 19 (1st Cir.1988)), that is, "those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Grendel's Den*, 749 F.2d at 955 (internal citations omitted). The court must also consider other factors such as the type of work performed, who performed it, and the skill required to perform it. *Id.* at 950–51. Courts in this Circuit, including this session, have frequently tinkered further with lodestar calculations by separating "core" work (work

cumstances, "call[s] for a substantial reduction in any award, or, in egregious cases, disallowance." *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945 (1st Cir.1984); *Wilson v. McClure*, 135 F.Supp.2d 66, 73 (D.Mass. 2001).

2. The "lodestar approach" originated in a case under the Clayton Act, *Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir.1973), *appeal after remand*, 540 F.2d 102 (3d Cir.1976).

that is more "lawyerly" in nature) from "non-core" work (work that a lawyer performed, but that could have been done by someone else on their staff, such as filing or making telephone calls) when fashioning a lodestar amount, by charging non-core work at roughly two-thirds of the particular lawyer's rate for core work.[3] *See Wilson*, 135 F.Supp.2d at 72; *Ciulla v. Rigny*, 89 F.Supp.2d 97, 104–05 & n. 9 (D.Mass. 2000).

Recently, in determining an attorney's fee award in a civil-RICO case, *System Management, Inc. v. Loiselle*, 154 F.Supp.2d 195 (D.Mass.2001), this Court noted two United States Supreme Court decisions regarding the calculation of attorney's fees: *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) and *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986). In *Blum*, the Supreme Court held that the prevailing market rates in the relevant legal community should drive any determination of attorney's fees and defined "prevailing market rate" for the purposes of lodestar calculation.[4] In *Pennsylvania v. Del. Valley Citizens Council for Clean Air*, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986), the Supreme Court further explained its holding in *Blum*[5] and stated

---

**3.** The genesis of the distinction between a lawyer's "core" and "non-core" work in determining attorney's fees is found in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974), which the First Circuit adopted in *King v. Greenblatt*, 560 F.2d 1024, 1027 (1st Cir.1977).

**4.** In *Blum*, the definition for "prevailing market rate" was provided as follows:

[T]he critical inquiry in determining reasonableness is now generally recognized as the appropriate hourly rate. And the rates charged in private representations may afford relevant comparisons. In seeking some basis for a standard, courts properly have required prevailing attorneys to justify the reasonableness of the requested rate or rates. To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation. A rate determined in this way is normally deemed to be reasonable, and is referred to—for convenience—as the prevailing market rate.

*Blum*, 465 U.S. at 895–96 n. 11, 104 S.Ct. 1541.

**5.** In *Del. Valley*, the Court refined its earlier precedent in *Blum* and expanded on the import of a reasonable lodestar calculation as follows:

*Blum* restated that the proper first step in determining a reasonable attorney's fee is to multiply "the number of hours reasonably expended on the litigation times a reasonable hourly rate." We emphasized, however, that the figure resulting from this calculation is more than a mere "rough guess" or initial approximation of the final award to be made. Instead, we found that "[w]hen ... the applicant for a fee has carried his burden of showing that the claimed rate and number of hours are reasonable, the resulting product *is presumed* to be the reasonable fee" to which counsel is entitled. *Blum* also limited the factors which a district court may consider in determining whether to make adjustments to the lodestar amount. Expanding on our earlier finding in Hensley that many of the *Johnson* factors "are subsumed within the initial calculation" of the lodestar, we specifically held in *Blum* that the "novelty [and] complexity of the issues," "the special skill and experience of counsel," the "quality of representation," and the "results obtained" from the litigation are presumably fully reflected in the lodestar amount, and thus cannot serve as independent bases for increasing the basic fee award. Although upward adjustments of the lodestar figure are still permissible, such modifications are proper only in certain "rare" and "exceptional" cases, supported by both "specific evidence" on the record and detailed findings by the lower courts.

that there was a " 'strong presumption' that the lodestar figure represents a 'reasonable' fee." *Id.* at 555, 106 S.Ct. 3088. It is important to remember that under *Blum* and *Del. Valley,* the applicant bears the burden of showing the claimed rate and hours expended used in determining the lodestar figure are reasonable. Only a lodestar figure that is shown to be the product of these reasonable numbers will benefit from the presumption outlined in these cases, and be said to have taken the Model Code factors into account. *Del. Valley,* 478 U.S. at 564, 106 S.Ct. 3088.

Mindful of the teachings of these two cases, this Court determined that the Model Code factors, while relevant, were already included in the lodestar calculation, and that because the lodestar calculation presumably captured the balance of all the Model Code factors, the Court did not need to distinguish core from non-core tasks to determine a reasonable attorney's fee. *System Management,* 154 F.Supp.2d at 208–09. Thus, even though both parties had requested it, the Court found no need

to separate core work from non-core work in determining the amount of attorney's fees to be awarded (though admittedly it had done so in the past, *id.* at 209 n. 2), nor to discount the lodestar calculation based on the results obtained or other sundry factors. *Id.* at 211–12.

■ As in *System Management,* the statutory authorization for attorney's fees in this case is mandatory and does not ask the Court to exercise its discretion,[6] and therefore the calculation of attorney's fees in this case will be arrived at under the same method as in *System Management.* The Court will not "tinker" with the lodestar calculation by separating core from non-core work, even though both parties request it, and will remain true to its earlier determination that an adjustment of the lodestar figure in such ways is discretionary according to the Supreme Court. Similarly, upward or downward adjustments of the lodestar fee based on the degree of success, which both parties, respectively, have argued for in this case, will likewise not be considered.[7]

---

*Del. Valley,* 478 U.S. at 564–65, 106 S.Ct. 3088 (internal citations omitted).

6. The Court's lack of discretion here stands in contrast to other fee-authorizing provisions, such as the Civil Rights Attorney's Fees Awards Act, 42 U.S.C.1988(b), which states that the Court *"may* allow" attorney's fees to the prevailing party *"in its discretion."* (emphasis added).

7. Besides the holdings of *Blum* and *Pennsylvania* and this Court's findings in *System Management,* a further public policy justification argues against basing an award for fees in this case based on the "degree of success obtained." Pastor argues that because only "10 to 20%" of the relator's claims were ultimately successful, Def.'s Mot. at 2, (i.e. only a small fraction of the claims in Averback's original Complaint figured in the settlement between the U.S. Attorney's Office and Pastor,) that her award should be subject to a significant downward adjustment based on the results obtained. *Id.* at 31–39. Such a

result would penalize a relator for bringing a complaint, eventually adopted by the U.S. Attorney, that contained claims that the U.S. Attorney's Office, in its discretion, decided not to pursue in its investigation or use as leverage in any settlement negotiations. This is not equivalent to a jury's (or court's) decision that a claim is without merit. Further, the purpose of the False Claims Act, as the government's "primary litigative tool for combating fraud," is to encourage individuals aware of government fraud to produce that information, by increasing monetary incentives and providing whistle-blower protection. *See* Senate Rep. 99–345, 99th Cong. Rec. (Second) (1986) (1986 WL 31937). It would fly in the face of the "private attorney general" motivation behind the False Claims Act to parse out complaints and attorney billing records to such a point where any hours researching claims found somehow "unsuccessful or "unrelated" to the final settlement in a case that was never litigated in open court would be deducted from the total hours

The Court's task, succinctly, is to make sure Averback has provided reasonable figures for hours worked and hourly rates in her application for a fee award. If so, issues such as "the degree of success obtained" and "complexity of the case" have presumably been considered and need not be directly addressed, unless the Court determines that circumstances warrant an adjustment of the lodestar figure based on such factors. The lodestar figure, according to the Supreme Court in *Blum* and *Del. Valley*, is presumptively reasonable, already takes such factors into account, and is driven by the prevailing market rate. That said, the Court now turns to determining whether the hours expended on her claim are reasonable, and ascertaining the prevailing market rate for attorneys of comparable experience and skill as Averback's counsel.

## A. Calculating the Lodestar

### 1. Reasonable Hours Expended

▮▮▮ The Court begins with the number of hours listed in the contemporaneous billing records for each person who worked on Averback's case. "To determine the number of hours reasonably spent, one must first determine the number of hours actually spent and then subtract from that figure hours which were duplicative, unproductive, excessive, or otherwise unnecessary." *Grendel's Den,* 749 F.2d at 950. The court must determine "whether counsel substantially exceeded the bounds of reasonable effort." *United States v. Metro. Dist. Comm'n,* 847 F.2d 12, 17 (1st Cir.1988) (citation and internal quotation marks omitted); *see also Rolland v. Cellucci,* 106 F.Supp.2d 128, 134 (D.Mass. 2000) (Neiman, M.J.); *Guckenberger v.*

*Boston University,* 8 F.Supp.2d 91, 99–100 (D.Mass.1998) (Saris, J.). The Court should further discount claimed hours by excluding time spent on unsuccessful claims that were not related to the successful ones and can be easily severed; it may, but need not, eliminate claims for hours spent on unsuccessful but interconnected claims. *See Gay Officers Action League v. Puerto Rico,* 247 F.3d 288, 295–297 (1st Cir.2001); *System Management,* 154 F.Supp.2d at 208.

▮▮▮ Using these guidelines for calculating the amount of hours actually spent on this matter, the Court notices the following: Borten and Gorovitz, together, claim 348.30 hours of "core" work and 16.40 hours of "non-core" work in their 14 page billing statement dated August 21, 2001 and contained in the record as Exhibit A to defendant's Motion for an Award of Legal Fees [BDocket No. 56]. The "non-core" distinction will not be made in this case, as explained previously, so Borten and Gorovitz are claiming 364.70 total hours of work. The 16.40 total hours claimed as "non-core" work on the bill submitted to the Court consist entirely of travel time by both attorneys to various meetings and document filings. The Court rules that requiring Pastor to reimburse Averback for this travel time to be excessive and unreasonable. Therefore, 16.40 hours will be subtracted from the total hours Borten and Gorovitz claim, reducing their total claim to 348.30 hours.

▮▮▮ Next, Pastor submits that Averback was represented by Borten and Gorovitz in the entirety of her private state-law actions as well as her federal one and thus that any work done prior to the filing of

claimed in a fee application under section 3730(d)(1)." Such a rule would provide a disincentive to an attorney to bring any borderline claims at all, for fear that their work

would not be reimbursed, and would greatly impact the scope and efficacy of complaints brought under the False Claims Act.

the federal complaint, in May 1999, is duplicative and should not be assessed against them. Def.'s Mem. at 16—21. This is incorrect. A closer reading of the record reveals that Borten joined White as co-counsel in Averback's private state-law actions on January 28, 1998, became sole counsel in these actions on February 24, 1999, when White withdrew, and that Gorovitz joined Borten as co-counsel on June 24, 1999. Until White's withdrawal, Borten acted only as a consultant for White, who was lead counsel in these actions. He was retained by White to assist in taking depositions and, according to counsel working with White, "[h]is [Borten's] involvement [in this case] was primarily due to the fact that he was familiar with the inner workings of a medical office and the particular billing system used at Pastor Medical during the period in dispute." Fulgione Affidavit at ¶ 7; *see also* Borten Affidavit at ¶ 9. Borten does bill his time in the present matter for the reading and digesting of depositions that were taken in the private action,[8] but it is reasonable to assume that he was now reading them with a federal health-care fraud claim in mind and not a private tort suit, and was also preparing extracts from them at the request of Agent Dennis, *see* Borten Affidavit at ¶ 16; Rel.'s Mot., Ex. A at 3, which naturally would necessitate extensive review. The Court cannot engage in a speculative calculation of how long an attorney *should* take when reviewing depositions and preparing abstracts before embarking on a completely new cause of action, as Pastor requests, and takes at face value the time Borten charges for the review of these depositions. Pastor's claim that such work is duplicative, and indeed that much of the work billed by Borten and Gorovitz was done with the private actions in mind or represents "double-billing"[9] because it was undertaken during the previous suit, is rejected here as purely speculative. Such a claim is not supported by, or in accordance with, the evidence currently before this Court.

■ Finally, Pastor charges that Averback's counsel, specifically Borten, is attempting to bill over 60 hours in which he was engaged in a "primer on basic health care statutes and regulations [in order] to

---

**8.** These entries are dated April 12–16, 1998 and concern the review, digesting and preparing of extracts from the depositions of Dr. Averback, Tracy Crowell, Dr. Katz, Dr. Krause, Harry Silverman, Joyce Pastor and Dr. Pastor. Pl.'s Mot. Ex. A at 3.

**9.** Of course, proof that Borten charged Averback for these tasks in the private litigation as part of White's bill would be sufficient evidence of "double-dipping" and would cause these hours to be subtracted from the current total. As Pastor notices, Def.'s Mot. at 14, these billing records have not been produced by Averback. The original billing records for the times Pastor is most interested in, however, are probably in the possession of White, Inker, & Aronson. Further, Pastor mis-characterizes Borten and Gorovitz's role in the private actions (Borten was co-counsel for much of the action and Gorovitz came in very late in the game) and, while these records no doubt should have been produced, the fact that they were not does not change the Court's assessment of the number of hours properly billed in this federal action. Looking at the billing records given to this Court in the instant case, it is clear that there would have been no reason to review federal statutes, prepare a complaint to be filed in federal court, or meet with the U.S. Attorney and the FBI, (which form the majority of the entries in Averback's bill), when litigating a state-law action based in tort. As stated previously, deposition review would have been necessary to prepare abstracts for Agent Dennis regardless whether Borten had individually conducted or been present at these depositions in the original private actions, especially given the difference in the underlying claims. The Court is satisfied the entries in the bill submitted by Averback represent work done only on the federal matter and are not duplicative.

gain the baseline knowledge necessary to articulate claims of violations of federal law." Def.'s Mot. at 20. In fact, this appears to be the case, but this alone does not make the hours billed for such work deductible from this fee application. Indeed, this speaks to counsel's experience and the rate he should expect to charge, not to the total hours worked.

■■■ Of these "60 hours," the Court sees fit to deduct only two entries. First, Borten charges three hours on April 15, 1998 for his attendance at a seminar that discusses Stark II proposed regulations and compliance. Rel.'s Mot., Ex. A at 1. According to Borten, it was this seminar that gave him the inspiration to pursue a federal claim on Averback's behalf in the first place. Borten Affidavit at ¶ 10. Such a seminar should not be charged to his client or, by extension, Pastor, and is more properly thought of as professional development. All the other review of applicable federal law and books written on healthcare fraud represents substantive legal work that is fully billable, albeit not at the rate of a litigator *experienced* in healthcare fraud cases, as will be discussed more fully below. Second, Borten charges for the review of a Massachusetts statute, Mass. Gen. Laws Ch. 175H, § 1, for approximately 1.10 hours on April 27, 1998, and again for 2.20 hours on May 5, 1998, for a total of 3.30 hours. Rel.'s Mot., Ex. A at 1. His review of this state statute is completely unrelated to this federal claim and the hours claimed for reviewing it are unnecessary and fully severable. Averback's counsel may have done other work that concerned statutory provisions that did not enter into the settlement the U.S. Attorney made with Pastor, as Pastor argues in its opposition, but the Court will not engage in the extreme hindsight Pastor advocates by only including hours spent as part of "successful" federal claims

that were addressed in the settlement. The rest of the hours billed by Borten and Gorovitz are properly included.

Taking these 6.30 hours from the total of 348.30 hours, the figure after the subtraction of travel time, Averback is left with a total of 342 hours. With this total calculated, all that remains is deciding the proper hourly rate and multiplying the two to reach a lodestar figure.

### 2. Reasonable Hourly Rates

■■■ Under *Blum,* the Court must consider the rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." 465 U.S. at 895–96 n. 11, 104 S.Ct. 1541; *see also Grendel's Den,* 749 F.2d at 955. It is the plaintiff's burden to provide this Court with affidavits and other forms of evidence that both: (1) establish the requesting lawyers' skills and experience, which forms the basis for their claimed hourly rate; and (2) to inform the Court of the prevailing rates in the community for similarly qualified attorneys. *Blum,* 465 U.S. at 895–96 n. 11, 104 S.Ct. 1541; *Calhoun v. Acme Cleveland Corp.,* 801 F.2d 558, 560 (1st Cir.1986) (applicant bears burden of providing the court with "information about fees customarily charged in the locality for similar legal services and information about the experience and billing practices of the attorneys in question"); *Guckenberger,* 8 F.Supp.2d at 105 (same). Information provided to the Court about the prevailing market rate in the relevant legal community should include more than affidavits from the requesting attorneys. *See Bordanaro v. McLeod,* 871 F.2d 1151, 1168 (1st Cir. 1989).

■■■ Averback has come up woefully short in meeting this burden. Neither Borten nor Gorovitz have described their skills, experience, or customary billing rate

in the form of a sworn affidavit. The Court has received only: (1) a brief description of Borten's qualifications as part of Averback's request for attorney's fees, Rel.'s Mot. at 14; (2) Borten's *curriculum vitae*, Rel.'s Mot, Ex. B, and (3) a short affidavit describing Borten's involvement in Averback's case, which includes one paragraph about his background, Borten affidavit at ¶ 3. Taken collectively, these materials inform the Court that Borten graduated from Suffolk Law School in 1987, that he has been a member of the Massachusetts Bar for over 14 years, that he has extensive medical expertise as an obstetrician/gynecologist, that he has an impressive record of medical publications and lecture engagements, and that he is an adjunct professor at Suffolk Law School. What is lacking, however, is any substantive information on Borten's trial experience as a litigator or customary billing rates.

The only information provided to the Court justifying the hourly rate Borten claims is the summary assertion by counsel in their motion that: "Because of his extensive medical-legal background Attorney Borten brings a strong, if not imposing presence" in this case and further:

> This level of insight, knowledge, and experience in the workings of a medical practice, the manner in which reimbursement should properly be requested, and compliance with the applicable federal statutory framework, is virtually unparalleled in the greater Boston legal

market. An equivalent level of experience might only be found within a Senior Litigator at a major, large scale Boston law firm. Rates normally charged by such an individual, who would have better than 20 years experience yet still be without the requiste [sic] medical background—would be in the magnitude of $350.00—$400.00 per hour in today's economy. Although Attorney Borten is not a member of a major, large sized firm located in downtown Boston, his presence and credentials, working knowledge, experience and insight, would warrant an equivalent hourly rate.

Rel.'s Mot. at 15–16. The Court does not refute the assertions made as to Borten's knowledge of customary billing practices in a hospital setting; indeed, this appears to be why White retained him as co-counsel in 1998. But such a statement by the moving party does not suffice as a basis for an hourly rate of compensation in an attorney's fees application.[10] The Court is unable to ascertain Borten and Gorovitz's experience as litigators on such a poor showing and cannot evaluate their claims of extensive experience, in either a case involving health-care fraud or any other type of action.

▮ In setting the prevailing hourly market rate, Averback's attorneys have done a somewhat more credible job, though just barely. They point to the *Guckenberger* decision, 8 F.Supp.2d at 105, which sets "rates of $325 per hour for

---

10. The justification for Attorney Gorovitz' claimed hourly rate is no better, and, incredibly, no resume or other independent document verifying his background or status as a member of the bar is included for him. The only statement regarding Gorovitz's qualifications is as follows:

> Attorney Gorovitz has been a member of the bar for 30 years. Attorney Gorovitz is an experienced litigator, specializing in complex civil litigation matters. Attorney

Gorovitz was co-counsel with Attorney Borten, and both Attorney Gorovitz and Attorney Borten were senior partners in the relator's law firm of Pearlman, Gorovitz and Borten, the predecessor to Gorovitz and Borten. Attorney Gorovitz has achieved favorable large-sum decisions on behalf of plaintiffs in complex civil litigation and medical malpractice matters.
Rel.'s Mot. at 16–17.

litigation partners in a large Boston firm." Rel.'s Mot. at 18. Even were this assessment of the prevailing market accepted, where they fail is in showing that *their* skills are comparable to those of litigation partners at a major law firm, and therefore that they deserve the same rate of compensation that *Guckenberger* sets for such attorneys.

In the absence of affidavits or other proof of Averback's counsel's customary billing rate or experience as litigators, the Court cannot grant the rate they seek in this fee application. For this reason, their requested hourly rate of $325 an hour is rejected. Indeed, looking at the entries on counsel's time records, any claim that they possess extensive experience in *qui tam* actions involving health care fraud is farfetched, to say the least. Counsel spent over 60 hours reviewing the basic statutes underlying such actions, reading introductory legal texts on the subject, and conducting lengthy telephone conversations with four acknowledged experts in this area of the law and reviewing materials these persons sent to them following these conversations. While it is true that partners at major firms frequently enter areas of law with which they have only a passing familiarity, and must conduct such review and consult with experts, these facts still belie counsel's claims that their expertise makes them worthy of the lofty hourly rate they claim. Furthermore, one can surmise that an experienced litigator would know how properly to apply for an award of attorney's fees with supporting affidavits. Counsel, based on their performance here, clearly do not—a further indication of their apparent *inexperience* in bringing cases of this type.

Moreover, Pastor has submitted evidence to this Court that directly refutes the claimed experience and requested hourly rate of the attorneys in question.

Borten previously filed an affidavit in connection with Averback's private claims, which Pastor submits as Exhibit 9 to its motion, in which he testified under oath that his "normal hourly rate when dealing with health care matters is $225.00." Def.'s Mot. Ex. 9 ¶ 18. He asserted this hourly rate in reference to a request for discovery sanctions in a case closely related to the present one, and the Court finds it near-impossible that Borten could credibly argue that his rate for this case should be significantly higher. After all, his claimed "expertise" in the area of billing practices was relevant to both cases, and he obviously could not have gained much, if any, experience as a litigator in the brief interim between the two cases. The Court looks askance upon the fact that Borten has previously quoted an hourly rate of $100 less than that requested here without noticing this fact in his petition or explaining the differential, and that the defense was forced to bring this fact to the Court's attention. Indeed, this behavior will be taken into account in determining Borten's rate for this case.

Finally, Borten's resume shows a decided lack of actual legal experience; simply put, for most of his professional life he has worked primarily as a physician. On his curriculum vitae, his first legal job outside academia can be found in 1997 when he became of counsel to the firm of Hermes, Netburn, Somerville, O'Connor & Spearing. Rel.'s Mot. Ex. B at 3. Given that Borten joined Averback's case in early 1998, it is safe to say this case is one of the first he has ever handled as a litigator. Bluntly, Borten possesses nowhere near the experience of a "Senior Litigator at a major Boston firm," despite his claim.

Meanwhile, Gorovitz provides no materials at all to this Court regarding his experience. The Court will thus treat the two attorneys as identical and give them the

same hourly rate, which, taking attorney Borten at his word, cannot exceed $225 an hour.

Indeed, $225 an hour is the *maximum* Borten and Gorovitz can expect. The only question for the Court is whether it will go lower than this ceiling, not only because of counsel's relative inexperience, but also as a sanction for the complete and utter lack of evidentiary support underlying their claimed hourly rate. Given the nature of the request for attorney's fees filed by counsel in this case—a petition lacking even the most basic evidentiary support in the form of sworn affidavits, and the fact that in a related case, one of the requesting attorneys testified to an hourly rate of some $100 less than that requested here— sanctions will be imposed as a deterrent to such conduct in the future. Borten and Gorovitz will not only fail to be compensated at their requested rate of $325 an hour; the $225 an hour that Borten customarily charges will also not be awarded.

In determining how far below this ceiling to go, the Court notes Pastor's assertion that Borten's real level of legal experience when this case settled was that of a junior associate. Def.'s Mot. at 28. As Pastor points out, this Court has set the rate of compensation for third-year associates at $120 per year. *Wilson*, 135 F.Supp.2d at 72. The Court also notes, however, that it is unlikely that a third-year associate would have been so well-versed in the billing practices of major hospitals (by virtue of a career in medicine) that he would be hired as a consultant and co-counsel in a private lawsuit related to health-care matters, as was Borten. Therefore, while $225 an hour is too high, $120 an hour is too low, because Borten did bring a special kind of expertise to this case from the outset based on his commendable level of experience as a highly-qualified physician. His knowledge of a major hospital's billing practices would have been indispensable to *any* legal team handling a *qui tam* action for health-care fraud. Therefore, the Court will split the difference between Borten's "customary" rate ($225 an hour) and the Court's typical rate of compensation for third-year associates ($120 an hour), to reach an hourly rate of $175 an hour. Borten's experience as a physician, and familiarity with hospital billing practices, is the *only* reason he is allowed to charge at a rate higher than his level of legal experience would permit.

Calculating the reasonable numbers of hours spent on the litigation in question as 342 total hours and using an hourly rate of $175 an hour, the Court finds the lodestar figure in this case to be $59,850.

### 3. COSTS

■■■ After reviewing Averback's requests for costs, the Court finds the enumerated expenditures to be reasonable save one: a disbursement for an expert's fee for $395 on January 3, 2000 for the review of materials in preparation for the filing of the Complaint. Pl.'s Ex. A at 13. As Pastor correctly points out, this request for an expert's fee is not backed up by disclosure of the expert's billing rate, qualifications, and without explanation of the nature of the review conducted or justification for the review. Def.'s Mot. at 26. Under *Guckenberger*, such a request for an expert's fee must be denied, and is here. *See Guckenberger*, 8 F.Supp.2d at 111–112 (denying reimbursement for expert fees where the plaintiff did not indicate "the expert's rate, hours spent, nature of the work, [or] tasks performed"). Subtracting this fee of $395 from the total costs Averback claims were associated with this litigation, $2,304.90, leaves a figure for costs of $1,909.90.

## IV. CONCLUSION

Averback's petition for attorney's fees and costs under the False Claims Act's fee-shifting provision, 42 U.S.C. Section 3730(d)(1), is GRANTED. The lodestar figure is $59,850 and the fee for costs is $1,909.90, which together reaches a total of $61,759.90. Pastor is ordered to pay this amount to Averback, the prevailing plaintiff in this *qui tam* action.

SO ORDERED.